Joe Root, *Appellee,* v. The Cudahy Packing Com-
pany, *Appellant.*

No. 17,796.

SYLLABUS BY THE COURT.

1. Evidence — *Expert Witnesses — When Competent.* In this
state the opinions of experts are receivable in evidence only
on the ground of necessity where no better evidence can be
had, and are not receivable regarding an ultimate fact in issue
where the subject can be presented to the jury so that the
jury itself is capable of drawing the ultimate inference.

2. Negligence — *Packing Company Elevator — Best Evidence.*
In this case the opinions of experts were received in evidence
to show that it is possible, under the principle upon which
friction-hoist elevators are constructed, for the car to fall in
the course of its ordinary use for packing-house purposes,
although all the appliances are in good mechanical condition,
and that such an elevator is unsafe for such use. It had been
the business of the experts to construct, inspect and repair
such elevators, with whose operation and use they were per-
fectly familiar, their experience having been gained in the
principal packing houses of Kansas City, where such eleva-
tors have been in common use in large numbers for many
years. *Held,* the best evidence of the reliability or unre-
liability of such elevators consisted in the demonstrated re-
sults of their use; that with the facts relating to their per-
formances before it the jury would have been competent to
judge of their safety; and that the opinion evidence was im-
properly received.

3. ——— *Elevator Must be Reasonably Safe for Such Use.* A
packing company using an elevator for the purpose of convey-
ing truck loads of meat and the employees handling the trucks
from one floor of its packing house to another owes such em-
ployees the duty of using ordinary care to furnish an elevator
reasonably safe for such use.

4. Fall of Elevator—*No Presumption that Employer was Neg-
ligent.* The sudden fall of such an elevator in the course of
its ordinary use by a truckman, whereby he is injured, does
not warrant a presumption of negligence contributing to the
injury on the part of the employer.

5. ——— *Evidence Insufficient—Demurrer Sustained.* The evi-
dence considered, and held that the defendant's demurrer to
that offered by the plaintiff should have been sustained.

Appeal from Wyandotte court of common pleas. Opinion filed January 11, 1913. Reversed.

*J. E. McFadden,* of Kansas City, and *O. C. Mossman,* of Kansas City, Mo., for the appellant.

*James F. Getty,* of Kansas City, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The plaintiff, an employee of the defendant, sued for damages resulting from personal injuries occasioned by the fall of an elevator in the defendant's packing house. The plaintiff recovered and the defendant appeals.

The elevator is of the common friction-hoist type. In this instance the machinery by which the car is operated is located under a suitable covering on the roof of an adjacent building. The essential parts of this machinery are a friction wheel of vulcanized paper with a face some twelve or more inches in width, a cast-iron bull wheel some thirty or forty inches in diameter and having a twelve-inch face, a wooden brake block fitting the bull wheel, a spool-shaped drum on the same shaft with the bull wheel and a control lever. The necessary attachments are a cable which lifts the car, an operating lever inside the car and a wire cable which connects the operating lever with the appliances above. One end of the car cable is fastened to a header. It passes thence over a sheave at the top of the well, then down under a second sheave fastened to the top of the car, then up over a third sheave at the top of the well and then to the drum on the bull-wheel shaft. This shaft is located between the friction wheel and the brake block. When the shaft rests at the central point between the friction wheel and the brake block the bull wheel touches neither of them. The shaft, however, is movable, so that contact may be established between the bull wheel and the brake block on one side of it or the friction wheel on the other side.

The control lever is adjusted to this sliding shaft.  On the arm of the control lever is a weight which bears the lever down in such a way as to push the bull wheel against the brake block and hold it there.  This contact can only be broken by means of the operating lever in the car.  When the bull wheel is against the brake block the operating lever points upward at an angle of sixty or sixty-five degrees.  When the lever is pulled down the wire cable draws the sliding shaft away from the brake-block side of the frame in which it rests and toward the friction wheel.  If the lever be pulled down far enough the faces of the bull wheel and friction wheel are pressed together.  Power is communicated to the friction wheel, which revolves constantly while the power plant is in operation.  To raise the car the operating lever is pulled down until contact is established between the bull wheel and the friction wheel.  The friction of their surfaces causes the bull-wheel shaft to revolve and wind up the car cable on the drum.  To stop the car the operating lever is simply released.  The control lever then withdraws the bull wheel from the friction wheel and thrusts the bull wheel back against the brake block, which locks the bull wheel and holds the car stationary.  The operating lever returns to its original position.  To lower the car the operating lever is pressed down far enough to release the pressure of the bull wheel against the brake block but not far enough to establish contact with the friction wheel.  The car then descends by force of gravity.  The elevator is equipped with the usual countervailing weights and with a safety device intended to arrest the descent of the car should the cable break.

The elevator is used for conveying loaded trucks of meat and the men handling the trucks from upper to lower stories of a department of the defendant's plant. It was operated by a man assigned to that duty, who also opened and closed the elevator gates.  On the day

the injury occurred the car was stopped at the fourth floor and the gates were opened. A trucker named Laskowski placed a truck load of meat in the car and stood between the handles of his truck on the side of the car next to the operating lever. The plaintiff then pushed a loaded truck into the car beside Laskowski's truck. The car commenced to descend, its progress was not arrested, and when it struck the bottom of the elevator well the impact was sufficient to throw the plaintiff down upon the handles of his truck and to the floor and severely injure him. His companion was somewhat jarred but otherwise unhurt. The operator was left at the fourth floor. His account of the affair was that before he could close the gates and enter the car Laskowski pulled the operating lever down, and as the car descended looked up and laughed at him. A trucker who was present also testified that Laskowski pulled the lever down, but Laskowski denied that he did so.

The petition charged two classes of delinquencies on the part of the defendant: First, that the type of elevator was inherently unsafe; and second, defective parts and want of inspection. No attempt was made to establish liability on the second ground proposed. On the other hand, the proof was that the various parts of the elevator were in proper condition, that regular inspections were made, that the elevator worked perfectly before the incident complained of, that the only result of the fall of the car was to dislodge the cable from one of the sheaves, and that when the cable was replaced the elevator again worked perfectly under severe tests and has ever since continued to do so. A somewhat indirect charge of overloading under the direction of a foreman was included in the petition, but the plaintiff himself testified that the elevator had carried larger loads many times before, and consequently the theory of too much weight in the car was abandoned.

The faults which it is claimed render a friction-hoist

elevator so dangerous that a reasonably prudent man ought not to adopt it were enumerated in the petition as follows:

1. There is a point at which the bull wheel touches neither the brake block nor the friction wheel, and consequently a point at which there is nothing to prevent the force of gravity from causing the car to descend.

2. No uniform speed can be maintained.

3. Because no uniform speed can be maintained no appliance can be attached insuring safety in case of accident.

4. No air cushion is provided at the bottom of the shaft to receive the car in case of a fall.

Of course the first criticism vanished before the plaintiff's own proof. There is nothing wrong in allowing an elevator cage to descend by force of gravity; and the principle of this elevator is that the bull wheel can remain at the free point only when the operator holds it there by means of the lever inside the car. If the operating lever be not manipulated, the weighted control lever holds the bull wheel securely against the brake block, and should the elevator be descending it can be stopped without utilizing the brake block and be made to rise by throwing the bull wheel against the friction wheel. Besides this, the car did not fall because there is a point at which the bull wheel touches neither the brake block nor the friction wheel. The bull wheel was in hard contact with the brake block when the plaintiff says the car commenced to descend.

The undisputed evidence of one of the plaintiff's witnesses (all the evidence on the subject) was that the operator maintains uniform speed for the car by the simple method of regulating the pressure of the bull wheel against the brake block. Besides this, the plaintiff does not claim he was injured because the operator at the time was prevented from keeping the car at a uniform rate of speed.

27—88 KAN.

The proposition that no safety device could be attached because uniform speed could not be maintained was left without support when complete control of speed was shown to be a feature of the elevator, and the matter of an air cushion at the bottom of the shaft is not referred to in any of the proceedings subsequent to the petition or in the plaintiff's discussion of the safety apparatus in his brief. So far as the proof shows it may be that some pneumatic device at the bottom of the shaft prevented the wrecking of the car and the killing of both men.

To the faults of the elevator specified in the petition the plaintiff now adds some others. This is done by going outside the pleading and by enlarging the pleading itself by interpretation.

It is said that the machinery controlling the movement of the car is not permanently connected with and under the control of the power, but only temporarily so when the bull wheel is pressed and held against the friction wheel. There is nothing whatever in the evidence to indicate that this is a fault. No motor is required to drive the car down or to hold it stationary. Gravity acting on the car does the one kind of work, and gravity acting on the weight attached to the control lever does the other. When other power is needed the operating lever connects it. Such is the principle of the friction-hoist elevator, and the principle is not unsound merely because another kind of elevator might be built with more complex machinery and using more power. It is said that there is a point where the bull wheel is midway between the friction wheel on the right and the brake block on the left when there is absolutely no means of controlling the movements of the car. This statement suppresses from the mechanism the operating lever whereby the bull wheel may be thrown either against the brake block or against the friction wheel and so is contrary to the fact. It is said that when the car is suspended at a height there is nothing

to hold it in place and prevent it from falling but the degree of pressure of the bull wheel against the brake block produced by the weight on the control lever, and that no way is provided whereby the operator can increase this pressure.  This is true, and so long as the car is not overloaded nothing more than the weight on the control lever is required to hold the car stationary.  If more than ordinary pressure is desired the weight may be correspondingly adjusted or increased.

The petition contained an allegation that the apparatus for stopping the car in case the appliances for lowering or raising it or holding it stationary should refuse to work was *insufficient,* worn, and had not been properly inspected or kept in repair.  This allegation was interpreted by the petition itself in the statement of the specific causes of the plaintiff's injury.  These causes were said to be "defective, faulty and improper construction" of the elevator, "the old, worn and unfit condition of the appliances attached thereto for stopping and holding the same," and the lack of an air cushion.  There was no charge that some other safety device should have been attached in addition to the one for stopping the cage if the cable should break, and the plaintiff plainly counted upon nothing in respect to safety devices except the bad order of the one in use and the lack of an air cushion.

Assuming, however, for the plaintiff's benefit that his petition charged what he now claims, his proof failed to show culpable negligence on the part of the defendant.  The purpose of a safety device is to keep the car from falling, and this elevator was already equipped with two safety appliances, the control-lever mechanism and the emergency device.  Should the cable break, the countervailing weights pull out steel teeth which catch into the guides at each side of the shaft and so stop the descent of the car.  The control-lever mechanism is in constant operation at all other times. It even resists the operator, and its opposition must be

overcome to permit the car to move at all. Besides this, should the brake block refuse to engage the bull wheel with sufficient tenacity to hold the car the operator may stop its descent by throwing the bull wheel against the friction wheel. Under these conditions some evidence of the inherent inefficiency of this type of elevator is essential before the question of lack of ordinary care on the part of a person adopting it arises. The bare suggestion of more safety devices is not enough.

The plaintiff made an effort to supply proof of the character indicated by offering the opinions of three expert witnesses. The defendant's master mechanic, John Matthewson, was called. He described the construction and operation of the elevator in detail, and then was asked whether or not the car would fall or run down rapidly, assuming that the appliances were all in good condition and that the control lever bore a weight proportionate to the load on the car. He answered that it would not. John Larson, a carpenter who had previously worked at millwright work at the packing houses of Swift & Company, the S. & S. Company and Ruddy Brothers, was called. A millwright is one who erects machinery. Larson had not seen the elevator in question but was familiar with the class. He was asked whether or not in his opinion it was possible for the car to fall or run down rapidly, assuming that all the appliances were in good mechanical condition. He answered that it was possible, because "if the bull wheel would get to starting, get a little bit wet, it won't hold—the brake block won't hold it." Philip Talbot, a millwright out of employment, was called. He had worked for the defendant and at the Armour and S. & S. packing houses, and was familiar with friction-hoist elevators. He was familiar with the elevator in question, and was asked whether or not it could be operated safely with a load of two men and two trucks of meat, such as were usual when he worked for the defendant. He answered that in his opinion it could

not be, but said he was not condemning the elevator directly because it was a friction-hoist elevator. He felt that no elevator was safe when overloaded.

None of these answers shows that friction-hoist elevators as a class are inherently dangerous for the uses to which this one was put or that this one was defective in any of the particulars relied on for recovery. Larson did not pretend to say that bull wheels in this type of elevator have such a tendency to get to starting or are so susceptible to moisture that they are unsafe, but considered it possible for the car to run down "*if* the bull wheel *would* get to starting—get a little bit wet"—a condition not disclosed by the proof. Talbot had no direct imputation of unsafety to make against friction-hoist elevators except such as attends them in common with others—danger from overloading, a matter of mismanagement not in issue.

The expert testimony was duly challenged. It consisted of opinions respecting a matter of mechanical theory and an ultimate fact in the case. Was it possible, under the principle upon which the elevator was constructed, for the car to run down, and was the elevator safe for use by the truckmen of the plant? In the development of the subject of opinion evidence the court long ago took the position that such evidence is admissible only as a matter of necessity where it is the best that can be had, as where the facts, situation or circumstances are such that they can not be presented to the jury in such a way that the jury itself can draw the proper inference from them; and that such evidence invades the province of the jury where it relates to an ultimate fact which the jury itself must find from all the evidence in the case, especially if the jury is as capable of drawing the ultimate inference as the witness. (*K. P. Rly. Co. v. Peavey,* 29 Kan. 169, 178; *Erb v. Popritz,* 59 Kan. 264, 269, 52 Pac. 871; *Telephone Co. v. Vandervort,* 67 Kan. 269, 270, 72 Pac. 771, and cases cited in these opinions.)

Upon a revision of the code of civil procedure the legislature allowed these restrictions upon the admissibility of such evidence to stand, and consequently they form a part of the settled law of the state. In qualifying his experts the plaintiff disclosed the fact that friction-hoist elevators have been in common use in large numbers in all the principal packing houses of Kansas City for many years. The defendant's evidence made the number more definite by showing that there were ninety-two of them. Take Talbot's testimony. He described the construction and operation of friction-hoist elevators in detail and said:

"I have worked at Armours, Cudahys and Schwartzschilds. I think I quit work at Cudahys about February, 1910, and had worked there three years off and on. While at Cudahys I worked on and about the repair and construction of the friction-hoist elevators used at that plant. . . . I worked at Armours a little over three years. The first two years in the carpenter department; off and on when they were short of men I used to help out in the millwright department, and I know of something like a dozen of friction-hoist elevators in the Armour plant. I believe they had three of these elevators at the S. and S. plant. At Cudahys I worked in the millwright gang all the time. I used to inspect elevators there. I inspected them once every morning. We would inspect the cage and see that everything was tight, in and about the cage, then we would go up to the friction house and inspect the frictions and the machinery they are connected with. I did that every morning, and in doing so I rode on the car. I think they have eleven of these elevators at Cudahys."

It is perfectly manifest that the question which should have been asked of this experienced man was whether or not the bull wheels of these elevators did in fact slip and permit cars loaded in the usual way to run down. In the opinion in the case of *City of Topeka v. Sherwood,* 39 Kan. 690, 18 Pac. 933, it was said:

"When the question of the proper condition or safety of anything constructed is to be determined, evidence

tending to show that it served the purpose for which it was designed is always competent, and often the most satisfactory and conclusive in its character." (p. 695.)

. Six years' observation of the use of these elevators for packing-house purposes was sufficient to verify the facts concerning their performances, and the best evidence of their reliability or unreliability consisted in the demonstrated results of such use. Nothing else. could possibly be so satisfactory or conclusive. The facts were perfectly capable of narration and comprehension, and with the facts before them the jury could say whether or not the elevators were safe or unsafe.

"Where the claimed defects in a county bridge are described by witnesses who have knowledge of them, and the character and extent of such defects are comprehensible by the ordinary mind, the jury are the judges of the safety of the bridge for travel, and it is not competent for a witness, even though an expert, to give in evidence his opinion as to the safety of the bridge." (*Murray v. Woodson County,* 58 Kan. 1, syl. ¶ 1, 48 Pac. 554.)

In the case of *Chandler v. Bowersock,* 81 Kan. 606, 106 Pac. 54, the opinion of a witness was received that the lever of a machine was likely to fall and throw the machine in motion, and that the machine was unsafe. There was some doubt whether the petition made the inherent danger of the machine an issue. It was held that the petition was broad enough to permit evidence to be given on that subject. It was then held that allowing the opinion of the witness to be given in evidence did not constitute prejudicial error for the following reason:

. "There was positive evidence that the machine had been in the habit for years of suddenly starting into operation without the lever being moved by anyone. Two or three young men who had been employed at the machine testified that in order to prevent the machine from starting itself they had been obliged to rig up an appliance with weights and strings to hold the lever in position." (p. 608.)

In other words, the proved conduct of the machine rendered the opinion of the witness as to how it might act and whether or not it was safe so superfluous and lacking in importance that the jury could not have been affected by it. In this case numbers of friction-hoist elevators lifted truck loads of meat and the men accompanying them day after day for long periods of time under the eyes of the experts who constructed, inspected and repaired them, and what the jury needed to hear was how the elevators actually worked instead of opinions regarding the soundness of an application of a mechanical principle.

Whether the elevator be regarded as a place or as an appliance, the defendant owed the plaintiff the duty to supply one which was reasonably safe. The plaintiff argues that he proved a violation of this duty when he proved that the elevator fell with great and unchecked velocity, under the doctrine of *res ipsa loquitur*. It is not necessary to discuss at length this much applied and misapplied phrase. It may be remarked, however, that it does not dispense with proof of negligence in personal-injury cases, and that it does not require a presumption of negligence from the mere fact of injury. The phrase expresses an argument in favor of an inference of negligence from the manner and circumstances of an injury. The argument, when expanded, may be stated in the language of the opinion in *Scott v. London Dock Co.*, 3 H. & C. 594, quoted in *Potter v. Rorabaugh*, 83 Kan. 712, 112 Pac. 613:

"'There must be reasonable evidence of negligence. But where the thing is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from want of care. (p. 600.)'" (p. 714.)

Wigmore discusses the subject under the head of "Burden of Proof—Presumptions," and after stating the considerations which limit the application of the phrase says:

"It may be added that the particular force and justice of the presumption, regarded as a rule throwing upon the party charged the duty of producing evidence, consists in the circumstance that the chief evidence of the true cause, whether culpable or innocent, is practically accessible to him but inaccessible to the injured person." (4 Wigmore on Evidence, § 2509.)

It may be freely granted that the sudden fall of an elevator cage in the course of its ordinary use warrants an inference of negligence. But, as between an employer and one of his employees, it does not raise a presumption of culpable negligence on the part of the former. This limitation on the application of the *res ipsa loquitur* doctrine was clearly stated in the case of *K. P. Railway Co. v. Salmon, Adm'x*, 11 Kan. 83. An employee was injured by the collision of two trains of the same company. The opinion reads:

"The said collision was the only proof of negligence on the part of the railroad company introduced on the trial. A collision always presumptively shows negligence, but whether *negligence of the company,* or negligence merely of some one or more of its officers, agents, or employees, is the important question in this case. As between the railroad company and a passenger, the negligence of any officer, agent, employee or servant of the company is the negligence of the company itself; but as between the railway company and one of its employees, the negligence of another employee, a coemployee, it not at all the negligence of the company. (*Dow v. K. P. Rly. Co.*, 8 Kan. 642.) Therefore, while a collision presumptively proves negligence on the part of the company as between the company and a passenger, yet it never proves negligence on the part of the company as between the company and one of its employees. It is a general rule that one employee does not represent the principal any more than any other employee, and negligence between coemployees is not

at all the negligence of the principal. This rule has its exceptions. As to railroad companies, the general manager, the general superintendent, the general officer for the employment or discharge of the other agents and servants of the railway company, or indeed any other general officer, would probably be the representative of the company, in fact *the company*, as between the company and all other persons, whether such persons were employees or not. But proof of a collision does not at all show negligence on the part of any one of these general officers. It tends more properly to show negligence on the part of the brakeman, the fireman, the engineer, the conductor, or some other inferior officer, agent or servant of the company, who has a more close and direct connection with the collision." (p. 91.)

This reasoning was approved and adopted in the case of *Railway Co. v. Taylor,* 60 Kan. 758, 57 Pac. 973, in opposition to the contention that knowledge of the defective and dangerous condition of cars in the ownership or control of a railway company should be presumed in favor of an injured employee. The decision in the cases of *A. T. & S. F. Rld. Co. v. Wagner,* 33 Kan. 660, 7 Pac. 204, and *Railroad Co. v. Tindall,* 57 Kan. 719, 48 Pac. 12, are to the same effect.

In the case of *Lane v. Railway Co.,* 64 Kan. 755, 68 Pac. 626, the syllabus reads:

"In an action against a railroad company for the recovery of damages for injuries to an employee occasioned by the alleged faulty construction of a split switch, the plaintiff must show, in order to warrant a recovery, not only the way in which the switch was constructed, but that such construction was not of a proper and approved kind, or, if of a proper and generally approved kind, that the one complained of was of improper and faulty construction.

"In order that a plaintiff may recover in such action, he must show negligence on the part of the company, and in the absence of a statute making it so, the fact of the occurrence of the injury raises no presumption of such negligence." .

The principle upon which these decisions are founded is the same whether applied to the construction and operation of a railway or to the construction and operation of an elevator.

Even in the case of a passenger on a railway train the mere occurrence of injury does not, of necessity, warrant an inference of negligence on the part of the carrier. (*Railroad Co. v. Burrows,* 62 Kan. 89, 95, 61 Pac. 439; *Hart v. Railroad Co.,* 80 Kan. 699, 102 Pac. 1101; *Brown v. Railroad Co.,* 81 Kan. 701, 106 Pac. 1001.)

In the last case the syllabus reads:

"To sustain an action for damages occasioned by the alleged negligence of another it is necessary for the claimant not only to show that the injury occurred, but to produce sufficient evidence to show *prima facie* that such injury occurred through the fault of the other. It is not sufficient to show circumstances which would indicate that the other party might have been guilty of negligence, especially when the evidence furnished suggests with equal force that the injury might have resulted without fault on the part of the other party."

In this case the so-called fall of the elevator car with its occupants, considered alone, indicates negligence on the part of some coemployee of the plaintiff, as for example, Laskowski, as much as it indicates negligence for which the defendant is responsible. Besides this, the "particular force and justice" of the rule relieving the injured person from showing the cause of the occurrence is wanting here because the plaintiff explained the cause of his injury fully in his petition.

"If the plaintiff possesses knowledge of the facts, and is able to plead them specifically and in detail, the reason for the rule disappears and with it the rule itself." (*Orcutt v. Century Bldg. Co.,* 201 Mo. 424, 443, 99 S. W. 1062, fall of an elevator.)

A criticism upon the phraseology of an instruction relating to the defendant's duty toward the plaintiff

is answered in the case of *Kamera v. Boiler Works*, 82 Kan. 432, 108 Pac. 806.

It follows from what has been said that the opinion evidence received by the court ought to have been excluded and that the demurrer to the plaintiff's evidence ought to have been sustained. It is not necessary to consider other matters discussed in the briefs.

The judgment of the district court is reversed and the cause is remanded with direction to grant a new trial.