No. 34,982

HOWARD GATES, *Appellee*, v. THE WESTERN CASUALTY & SURETY COMPANY, *Appellant*.

(112 P. 2d 106)

Opinion filed April 12, 1941.

*Robert C. Foulston, George Siefkin, Sidney L. Foulston, Lester L. Morris, George B. Powers, Carl T. Smith, C. H. Morris* and *John F. Eberhardt,* all of Wichita, for the appellant.

*C. H. Brooks, Howard T. Fleeson, Carl G. Tebbe, Wayne Coulson* and *Paul R. Kitch,* all of Wichita, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This was an action against the surety on the bond of a general contractor for state highway construction to recover for hauling base materials by truck for the construction of work under a parol agreement with a subcontractor. The jury answered special questions submitted by the court and returned a general verdict for plaintiff. After reducing the amount of the verdict the court rendered judgment thereon. Defendant has appealed.

The petition was in eight counts. The first contained allegations to this effect: That M. W. Watson had a contract with the state highway commission for the construction of a certain part of a state highway designated as a project and numbered; that he as principal and defendant as surety executed a bond to the state in a sum named, conditioned among other things to "pay all indebtedness incurred, whether by said principal, subcontractor or otherwise, for supplies, material or labor furnished, used or consumed in connection with or in or about the construction of the project for which said contract has been let . . ;" that one Charles Gates had a subcontract with M. W. Watson for the hauling of base materials on the project; that plaintiff worked for Charles Gates as a truck driver hauling base materials on the project under an oral contract of employment made April 26, 1938, by which plaintiff agreed to haul base materials in his truck and Charles Gates agreed to pay plaintiff at varying rates per yard-mile of material hauled, as later set out in the itemized statement of hauling done; that he had not been paid and there was due him a sum named, and that on December 17, 1938, which was within six months after the completion of the project, he sent to the State Highway Commission a verified statement of the sum due him pursuant to G. S. 1935, 68-410. Each count in the petition contained similar allegations. They differed only in the designation of the project and the account and amount claimed to be due. The sum alleged to be due was $1,342.40, less $528.26 credit for payments received, leaving a balance of $813.84, for which plaintiff prayed judgment.

The sole original defendant was the surety on the bonds of the contractor. Apparently later Charles Gates was made an additional party defendant, but the abstract does not show that he answered.

The surety on the bond answered, denying generally the allegations of the petition except those specifically admitted; admitted the residence of plainitff; that defendant was a corporation; that M. W. Watson, as a general contractor, had contracts pertaining to several projects for the construction of the state highway; that Charles Gates had a subcontract for the hauling of base materials upon a ton-mile basis, but denied that the rates varied, and alleged rate was in accord with a written contract between Charles Gates and Watson, a copy of which was attached to the answer; admitted that Watson had made a contract with the State Highway Commission for the project mentioned in the first count and for accuracy as to its contents set up a copy of it, and also admitted that a bond was executed with defendant as surety, as alleged. It contained a specific denial that the account attached to plaintiff's petition is true and correct, or that there is due and owing plaintiff the amount therein set forth, and alleged that the account had been paid in full, or that the same should have been paid by Charles Gates, or that the plaintiff is estopped to claim any balance due him on the account, for the reasons, briefly stated: (1) That plaintiff is the son of Charles Gates, the subcontractor; that Charles Gates executed the subcontract on behalf of himself and his partner, the plaintiff, and upon the representation that they owned the trucks that would be used for the hauling and it would not be necessary to hire or use other trucks; and (2) that after the work was completed Charles Gates and plaintiff went to the office of the general contractor, M. W. Watson, to determine the amount due, where all the hauling was computed, and the sum agreed upon as being due was paid by check to Charles Gates. By a cross petition the surety set up the facts and alleged that if Charles Gates had not paid plaintiff he is primarily liable therefor, and the surety should have judgment, over against Charles Gates, for any sum due plaintiff which it may be required to pay. The subcontract was in the form of a letter, dated April 23, 1938, written by Charles Gates to M. W. Watson and accepted in writing, which letter reads:

"I will haul gravel from your plant or plants to road projects as may be agreed upon from time to time for the sum of .0375 cents per cu. yd. per mile.

"I will pay all labor, gas and oil and repairs on trucks. Also Social Security; insurance and compensation on men, and carry public liability and property damage insurance on all trucks used on the projects.

"You are to pay the men each week for the hours worked and deduct gas and oil bills and pay any other bills on the job and deduct from the amount due me for haul and send the balance to me."

The reply was a general denial and a specific denial that plaintiff was at any time in partnership with Charles Gates. All pleadings were verified.

It will be necessary to give only a brief summary of the evidence. As provided in his subcontract with Gates, Watson paid plaintiff by check each week for the hours he worked. These checks aggregated $171.88. Although plaintiff's name appeared endorsed on each of them he expressed doubt in his testimony as to his signature on two of them totaling $30.10, stating:

"I don't know that I received the money on the checks or not. It has been so long ago that I can't remember that long. I have no records showing what money I received."

His father, Charles Gates, paid his bills for gas and oil amounting to $134.76. This item appears not to be challenged. Plaintiff testified he had received also from Charles Gates three checks, two for $100 each, which he had turned to the credit company to apply on his truck, and another check for $50. In his petition plaintiff alleged he had been paid by Charles Gates $250 in cash. In his statement of September 13, 1938, on account of moneys due him he listed two cash payments, one for $150 on June 27, 1938, and one for $100, August 11, 1938. At a former trial of this case plaintiff testified this $250 was paid him in cash and was used largely for living expenses, and that the only checks his father paid out to him were those used to pay his gas and grocery bill, that is, his eating bill.

Plaintiff testified he had an oral agreement with his father, made a week or two before the job began, by which he was to receive 3.75 cents per cubic-yard mile for each load hauled more than nine miles, and for a load hauled less than nine miles was to get the "state rates." Defendant objected to this testimony on the ground that as to the rate of pay plaintiff is bound by the contract between Charles Gates and Watson, and the further ground that the talk he had with his father before the Gates-Watson subcontract was executed was unknown to Watson or his surety and not binding upon them. This objection was overruled. It should have been sustained. On this point it is worthy of note that Charles Gates testified he had no such talk with plaintiff; that after his contract was signed with Watson he called the truck drivers together (there were more than thirty trucks used on the projects) and told them the rate of pay would be 3.75 cents per cubic-yard mile, whatever distance the load was hauled, and how payments would be made; that plaintiff was present

and was employed on the same terms as the other truck men. This is the only competent evidence we find in the record as to plaintiff's employment by Charles Gates. When plaintiff sent his written account to Watson, September 13, 1938, the pay claimed was computed at 3.75 cents per cubic-yard mile for all the hauling. Plaintiff's counsel sought to bring out in the examination of plaintiff, and in cross-examination of witnesses called by defendant, that there was in force a minimum "state rate" for truck hauling which varies per cubic-yard mile for the distance the load is hauled, being greater than 3.75 cents for distances of less than nine miles and less than that amount for greater distances, and in that way sought to create a right of recovery for more than 3.75 cents per cubic-yard mile for the loads hauled less than nine miles. Defendant's objections to this line of evidence were overruled. They should have been sustained. No issue of that kind was raised by the pleadings, if indeed it could have been. Plaintiff predicated his right to recover upon a parol contract with Charles Gates under his subcontract with Watson, and that is the measure of his right to recover.

Appellant does not contend there is substantial evidence to support its pleaded defense that plaintiff and Charles Gates were partners, and we find none. Upon its pleaded defense of waiver and estoppel defendant's evidence was to this effect: About the middle of August, 1938, after all the work was completed, plaintiff and Charles Gates went to the office of M. W. Watson at Topeka for the purpose of computing the sum remaining due for all the work; that because some of the records were with a Mr. Cahill, Watson's timekeeper at Russell, plaintiff and his father went from Topeka to Russell, where the records there were checked; that a few days later both of them returned to Mr. Watson's office at Topeka, where the computation was completed. There had been some claims made by truck men to the Watson office. These were taken into account and inquiry was made if there were any other claims; Charles Gates replied there were none; plaintiff made no reply; that the balance computed to be due was then paid, and that up to the time of this final payment plaintiff had made no claim of any sum due him personally to Watson or any of his employees. On this point plaintiff's testimony coincided with that of defendant's witnesses respecting the first trip to Topeka and the trip to Russell, except he testified that while at Topeka he told Watson's employees of his personal claims, and he denied being present in Watson's office at Topeka later when

the sum due upon the subcontract with Charles Gates was finally computed and paid. Under date of September 13, 1938, plaintiff wrote Watson the following letter:

"Enclosed you will find statement of Hauling Account for which I have not received payment in full. As you have made a satisfactory settlement with the other men on the job I think I am entitled to my hauling as well as they. Due to the fact I am the son of the contractor, I do not feel that I should take the loss.

"In regard to the fact that I own my truck (No. 1) and am making payments on it, I hope you can see my standing as an individual hauler. I have my state tickets for which payment has not been received if you would care to look them over.

"I am trusting you will make settlement as soon as possible."

With this letter his account was enclosed. A few days later he called Watson's office by telephone, asked if his letter and statement had been received and what was going to be done about it, and was informed the letter and statement had been received, and was told to get his money from his father.

Defendant's objections to specific instructions were overruled and a requested instruction was denied. Reading these instructions we are inclined to the view that some, at least, of the points contended for by defendant were well taken, but we shall not pass upon them for the reason that appellant does not argue them here, and perhaps proper instructions will be given upon a new trial, which we think must be granted for reasons soon to be stated.

Defendant drafted eight special questions and requested they be submitted to the jury. None of them was submitted. The court submitted to the jury eleven special questions. The record is silent as to who prepared them. Some of them, though phrased in different form, sought substantially the same information sought by some of the questions submitted by the defendant, but some of the questions deemed important by defendant were not submitted in any form.

The jury returned a general verdict for plaintiff for $793.48, and in answer to one of the special questions submitted found the total paid by Charles Gates to plaintiff, or on his behalf, was $443.80. Defendant filed a motion for a new trial, which included all necessary grounds. After argument of the motion the record shows the following:

"The Court: Gentlemen, you can often see how the Court is put on the spot. Not to escape any criticism in the least—that is the least thing that concerns me, always does—but the question is, can a jury ever arrive in a case of

this kind at what might be termed exact justice? Now, then, the Court may have erred in not giving the requested instructions—

"Defendant's counsel: You mean special questions, your Honor?

"The Court: Special questions. Yes, I mean special questions, because I didn't follow it through to the conclusion that Mr. Siefkin has in mind. It might be if those questions had been submitted to the jury and they had given an answer, we could easily see then, as Mr. Siefkin points out, whether or not certain payments were made in fact by Charles Gates. It is a test of veracity on both sides. As badly as I hate to grant a new trial in cases of this character, I wasn't myself exactly satisfied, maybe because of my own shortcomings and, too, probably owing to the shortcomings of the trial lawyers.

"Plaintiff's counsel: I would like to have you withhold your ruling.

"The Court: Let me point out just a minute. If this comes to trial again, I want to point this out to counsel on both sides: You can see my mistakes easily enough. You probably don't see your own when I do. Both sides worried the jury until its mind was filled with a lot of questions and answers which seemed to them wholly irrelevant and with no materiality at all and their mind was tired out with useless bickerings, we might call it. There is a lot of that enters into these trials. If you want time on the matter, I will wait for two weeks from today.

"Plaintiff's counsel: I would like for you to withhold your rulings.

"The Court: At the present time, however, I just want to let you know my inclinations because when the verdict was received I wasn't satisfied with it myself. My inclination will be to grant a new trial."

Upon the later hearing of the motion plaintiff's counsel stated:

"The only way is to allow a remittitur of $59.04—giving to the plaintiff an option of consenting to a remittitur of $59.04 or granting a new trial."

The court ordered the remittitur, which was accepted by plaintiff, and judgment was rendered for plaintiff in the sum of $734.44. The appeal is from this judgment and all adverse rulings.

Appellant contends the court erred in refusing to submit its special questions requested. The point is well taken. Our statute (G. S. 1935, 60-2918) gives a litigant the right to have such questions submitted. While the trial court should examine special questions requested to see that they are clearly stated and pertain to matters concerning which there is evidence which would support an answer, the court should not refuse to submit them. There is no contention that the questions requested were open to any infirmities.

Appellant argues it was error for the trial court to render its judgment upon a verdict with which the court was not satisfied, citing *Posey v. Johnson*, 145 Kan. 742, 745, 67 P. 2d 598, and many other cases. These authorities lay down the rule that it is the duty of a trial court to exercise an independent judgment upon the verdict

of a jury and not to approve it unless satisfied with it; that if dissatisfied with the verdict the court should grant a new trial. Appellee makes no complaint of these rules of law nor of the authorities cited in support of them, but contends the court did approve the verdict; that the only thing the court was dissatisfied with in the verdict was its amount, and having required a remittitur of $59.04, which was accepted by the plaintiff, the court then approved the verdict. The journal entry of judgment contains no recitation that the court approved the verdict. Normally by rendering a judgment upon a verdict the court is presumed to have approved it, but that can hardly be said here. The court's comments indicate a dissatisfaction with the verdict because special questions requested by defendant were not submitted; because there was much "useless bickerings" by counsel during the trial which worried the jury; and because the jury's findings rested upon the testimony of plaintiff. After the verdict the court seemed to realize that special questions requested by defendant should have been submitted. Much, if not all, of the "useless bickerings" of counsel might have been avoided had the court promptly ruled correctly upon incompetent evidence offered. It is true, also, that the verdict rendered appears to have rested upon the testimony of the plaintiff, although as to many material points it was in direct conflict with the testimony of other witnesses, including plaintiff's father, which normally would have been believed; even in conflict with his own testimony at the former trial, and in some respects with the statement of his account as submitted in writing to the contractor. It was therefore peculiarly the kind of a case in which the court should have exercised its own judgment as to the verdict. No figures in the record indicate a reason for the remittitur of $59.04. Appellee explains it in this way: The jury found plaintiff had received from his father $59.04 more than his testimony disclosed. Presumably the jury in reaching its general verdict deducted from the total amount plaintiff had coming to him the amount which it found plaintiff had received from Charles Gates. If that deduction was already $59.04 too much it seems that error could not be corrected by a further reduction of the same amount. The result is the trial court rendered judgment on a verdict with which it had expressed dissatisfaction after requiring a remittitur not authorized by the record.

The correctness of plaintiff's verified account embodied in his petition was denied under oath. Plaintiff was permitted to testify

he had figured up what was due him and the amount shown in the statement was correct. Defendant's objection to this method was overruled. The ruling was erroneous. To what extent this affected the result is not clear.

For the reasons hereinbefore stated, the judgment of the trial court is reversed with directions to grant a new trial.