No. 36,720

Mrs. Nina Colin, *Appellee*, v. DeCoursey Cream Company, *Appellant.*

(178 P. 2d 690)

Opinion filed April 5, 1947.

J. B. Patterson and Lawrence Weigand, both of Wichita, argued the cause, and A. W. Hershberger, Enos E. Hook, Richard Jones, Wm. P. Thompson, Claude I. Depew, W. E. Stanley, William C. Hook and Lawrence E. Curfman, all of Wichita, were with them on the briefs for the appellant.

*Paul R. Kitch* and *Wayne Coulson,* both of Wichita, argued the cause, and *Howard T. Fleeson, Homer V. Gooing, Manford Holly* and *Dale M. Stucky,* all of Wichita, were with them on the briefs for the appellee.

The opinion of the court was delivered by

HARVEY, C. J.: Plaintiff brought this action for damages for personal injuries she sustained and damages to her automobile resulting from a collison of motor vehicles alleged to have resulted from defendant's negligence. The jury answered special questions and returned a verdict for plaintiff for $20,000, upon which judgment was rendered. Defendant has appealed and contends the court erred (1) in refusing to give instructions requested and in the instructions given, (2) in refusing to submit special questions requested, and (3) in overruling a motion for a new trial predicated principally upon the ground that the verdict was the result of passion and prejudice.

The pertinent facts, not seriously controverted, are as follows: In Wichita, Broadway is a north-and-south street paved 48 feet wide. It is intersected at right angles by Kellogg, an east-and-west street paved 31 feet wide. Both carry heavy vehicular traffic. At each corner of the intersection there are traffic lights which show red, then yellow for three seconds, then green, then yellow, then the change is repeated. Under the city ordinance red means "stop," yellow "caution" and green "go." On the morning of January 3, 1945, the day was clear, the pavement dry and not defective. Plaintiff was driving her Pontiac coach west on Kellogg about 10:30 o'clock in the morning. When she neared the intersection with Broadway the traffic light facing her was red. A car in front of her was waiting for the light to turn green. Plaintiff stopped directly behind that car. When the light turned green both cars moved forward. When the front wheels of plaintiff's car, moving about 15 miles per hour, were 31 feet into Broadway her car was struck eight feet back of the front, on the left side, by the front part of defendant's truck. Plaintiff's car was thrown northward on Broadway, moved in a semicircle, and stopped at a point on the west side of Broadway with its front to the southeast, part way into Kellogg. Plaintiff was thrown from her car and seriously injured. Her car was damaged. Defendant's milk truck, which weighed 9,800 pounds, loaded with 9,200 pounds of milk gathered at points southwest of Wichita, was being driven north on Broad-

way by Lloyd Terry, the agent and employee of defendant. The truck had hydraulic brakes, with an air booster that is supposed to work on all wheels. It had no emergency brake. As Terry, driving north on Broadway, neared Kellogg, at about 20 miles per hour, he noticed the green traffic light change to yellow. At about 30 feet from the intersection he applied his brakes, and they did not hold, with the result that he drove straight through the intersection on the red light, struck plaintiff's car, as above stated, and the truck stopped on Broadway soon after it passed the intersection. Terry signed a report of the accident, in which it was stated that he was driving north on Broadway about 15 to 18 miles per hour. "The light had changed red when I came to the intersection and brake did not hold." He was arrested in the police court, charged with driving without due regard to the use and occupation of the street; that he had run a red light, and that he had defective brakes. He pleaded guilty to each of the charges and was fined $5 on each charge, and paid the fine and court costs.

From this recital it seems clear the jury and trial court were justified in finding defendant negligent. Indeed, there is no serious contention to the contrary.

Appellant complains that the trial court refused to give appropriate instructions requested. Among the allegations of plaintiff's petition was one to the effect that "Just before plaintiff started to enter said intersection she observed a large milk tank truck approaching from her left being driven in a northerly direction on Broadway." This allegation of the petition was specifically admitted in the answer. In her testimony at the trial plaintiff placed her car in the intersection "I imagine as much as 25 feet" when she saw the milk truck approaching. Defendant asked the court to instruct the jury "that it is admitted that just before plaintiff started to enter said intersection (Broadway and Kellogg streets) she observed a large milk tank truck approaching from her left, being driven in a northerly direction on Broadway." After some argument by counsel the court refused to give the instruction. At most, this is only a variance between the allegations and proof. Defendant had made no objection to plaintiff's testimony on that point at the time it was presented. In such a situation it has been held (*Woodard v. Timms*, 113 Kan. 413, 215 Pac. 456) that the variance is waived. Under our statute (G. S. 1935, 60-753) no such variance is deemed material unless it actually misled the adverse

party to his prejudice in maintaining an action or defense, and that where a party has been so misled it must be established by proof to the satisfaction of the court. No such proof was tendered. Counsel for plaintiff asked leave to amend his petition to conform to the proof. This was denied. We think that request might have been granted (G. S. 1935, 60-759), but the refusal to grant it is not a matter of which defendant has complained.

The trial court gave a complete and well-established instruction on the question of contributory negligence. The court also gave the following instructions:

"11. Any person operating a vehicle on a highway or street is bound to use due care and prudence, having regard for the safety of others who may be using the highway or street, and it is incumbent upon every driver to have his or her vehicle under proper control and be on a lookout for others who may be using the highway or street or about to enter thereon and to use the care and caution of a reasonable, prudent person.

"Such obligation is especially binding upon operators of vehicles as they approach intersections of highways or streets and each operator is bound by law to observe and heed all regularly established traffic warning signs and signals.

"12. You are further instructed that the laws of Kansas do not recognize comparative negligence and in the event that one party is clearly at fault and the other party is only slightly at fault, in the event that the fault of both contributed to and was one of the proximate causes of the resulting collision you are instructed that neither can recover from the other.

"16. If the traffic light had changed to green before the plaintiff entered the intersection, she had a right to assume that the defendant's truck would stop before entering the intersection from the south.

"17. You are further instructed that it is the duty of every person to exercise such care for her own safety as an ordinarily prudent person would exercise under the same or similar circumstances; and if you find that the plaintiff failed to exercise such ordinary care for her own safety and such failure was the proximate or a contributing cause of the resulting accident, injury, and loss to the plaintiff, then you are instructed that the plaintiff cannot recover."

Defendant asked the court to add to instruction 16 the following:

"Unless at that time she was aware of, or in the exercise of ordinary prudence, could and should have been aware of facts and circumstances which made her entry under those circumstances dangerous."

The court declined that request, and we think properly so, the subject being fully covered by the instructions given.

The jury was asked special questions and answered them as follows:

"1. At what speed was the defendant's truck proceeding at the time the signal light facing south on Broadway turned from green to amber? A. Approx. 20 miles.

"2. Approximately how far south of the intersection was the defendant's truck when the traffic light facing south on Broadway turned from green to amber? A. 150 feet.

"3. If plaintiff's car was stopped before she entered the intersection, did it appear to her, acting as a reasonable, prudent person, to be reasonably safe for her to start forward and enter the intersection at the time she did so, under the conditions then existing? A. Yes.

"4. If your verdict is for the plaintiff, state the amount you allow plaintiff for—

    (a) Medical expenses, including hospital and doctor
        fees? ........................................ A. $1,760.00
    (b) Pain and suffering? ......................... A. $9,044.00
    (c) Permanent injuries ......................... A. $9,044.00
    (d) Repairs to automobile? ..................... A. $152.00

"5. What if any negligence do you find against the defendant? A. Running red light, no brakes, no emergency brakes, careless driving.

"6. What if any negligence do you find against the plaintiff? A. None."

Appellant complains that the court did not give all of its special questions requested. Defendant requested seven questions, containing in the aggregate subdivisions, making the total thirteen. The court gave four of those, with subdivisions, making seven. Some of those given were worded slightly different from the corresponding questions requested, but appellant makes no complaint of that. The court added two questions, 5 and 6 submitted. The record does not disclose by whom they were requested, but no complaint is made of their submission. After the court had the questions formulated counsel for defendant objected to the refusal of the court to give two of its requested questions. One was: "Did defendant's driver immediately attempt to apply his brakes when the light changed from green to yellow?" Defendant's driver testified that he did so. There was no testimony to the contrary, hence there was no issue on that matter for the jury to decide. More than that, since the brakes were not working the fact was immaterial. The other question was: "Did the brakes on defendant's truck work prior to the time when he approached the intersection of Kellogg and Broadway?" Defendant's witness had testified the brakes had worked prior to that time. There was no testimony contradicting that, hence there was no issue on that question. More than that, it was immaterial whether the brakes

had worked or not prior to that time. We conclude it was not error for the court to refuse to submit those questions.

Appellant argues that under the statute (G. S. 1935, 60-2918) defendant had a right to submit ten questions, citing *A. T. & S. F. Rld. Co. v. Ayers*, 56 Kan. 176, 42 Pac. 722, and *Gates v. Western Casualty & Surety Co.*, 153 Kan. 469, 112 P. 2d 106. This is true, of course, if the questions are on any controverted fact, and material, and if they are of a type that there is evidence from which the jury can answer them. (See *Snyder v. Eriksen*, 109 Kan. 314 syl. ¶ 3, 198 Pac. 1080; *Murray v. Electric Co.*, 99 Kan. 507, syl. ¶ 1, 162 Pac. 1145; *Chapman v. Ticehurst*, 153 Kan. 310, 314, 110 P. 2d 785, and many other cases collected in Hatcher's Dig., Trial, secs. 266 to 281, and West's Dig., Trial, Key Nos. 349, 350.)

Appellant contends the verdict was excessive, caused by the allusion to insurance, which came about in this way: The physician who had treated plaintiff from the time of her injury to the time of the trial had testified at length, and on cross-examination was asked about the records he had concerning his calls and treatment. He was asked to get the record at the noon hour, from which defendant's counsel proceeded with his cross-examination. The pertinent portion of the record reads:

"Q. Now Doctor, I am going to hand you two exhibits here, one marked exhibit A, and ask you if that comprises the only detailed record that you have of this patient; or your attending this patient, in your office? A. Not the only thing but that's the only office record I have. I have reports here for instance that I made on May 9.

"Q. That is a letter you wrote to Mr. Kitch? A. I don't know who it is. This looks like an answer to some—I think it was some insurance man—a copy of what I wrote.

"Mr. Weigand: Now, Your Honor, I move that be stricken, what the Doctor thinks.

"The Court: That's what we are trying to stay away from. That will be stricken out and the jury will be instructed to disregard it.

"Q. You made the report to Mr. Kitch? A. Yes, sir.

"Q. Whatever writing you put in that report, plus this here, is the only record which you kept of this patient in your office? A. As I say, this record here—

"Q. (Interrupting) That wasn't a record. That was a report you made to Mr. Kitch of her condition wasn't it? A. No, they told me not to refer to that . . .

"The Court: Now Mr. Weigand, don't question him along that line unless you are sure what you are going to bring out."

Nothing further was said about it during the trial and no objec-

tion was made to the remarks of the court or any further request for instructions pertaining to the matter. It appears to have been treated as a closed incident. If there was any error in the matter it was occasioned by defendant's counsel, hence he is in no position to complain of it. In this court complaint is made of the remarks of the court. Since no complaint was made of them appellant cannot be heard to complain now. (*Tovey v. Geiser,* 150 Kan. 149, 159, 92 P. 2d 3.) More than that, we see nothing wrong with the court's remarks.

On the hearing of the motion for a new trial defendant called two of the jurors who had served on the case, each of whom testified in substance that one or several of the jurors stated that the defendant company wouldn't lose anything, but that the insurance company would have to pay it. The jurors testified, however, that they didn't know whether defendant was insured. The truck was of the type which under our statute requires that insurance be carried, a fact which was common knowledge. It is not surprising that some of the jurors should have made the remark they are credited with making. (*Sponable v. Thomas,* 139 Kan. 710, 33 P. 2d 721.)

Counsel for appellant argues that the size of the verdict demonstrates that it was the result of passion and prejudice. We cannot agree to that view. The damage to the automobile, $152, was stipulated. The jury allowed for pain and suffering $9,044 and the same amount for permanent injuries. Appellant argues that indicates a lack of clear analysis by the jury. We think this contention is unsound. The injuries under those headings merged into each other so that a complete separation was not possible. The evidence bearing on these items of damages may be summarized as follows: At the time of her injuries plaintiff was fifty years of age. She was born in Russia and she and her husband had been married almost thirty years. Their son was in the armed service of the United States and was expected home soon. She was a healthy, active woman. Her only illness in several years had been a sprained ankle in 1938, from which there was a reasonably prompt recovery. She was a capable and industrious housewife, took care of her own home, spaded her own garden, raised chickens, worked in the Service Men's Canteens at the bus depot and in the Union Station; was a Red Cross nurse's aid, was active in the work of the American Legion Auxiliary, in the work of the Sunnyside Baptist Church,

and for the Russian Relief Society. At the time of her injuries she was on a mission of gathering clothing for the Russian relief. When the plaintiff was thrown from her car by the collision, as above stated, she was rendered unconscious, but regained consciousness in an ambulance on the way to a hospital. On reaching the hospital she was in great pain. Emergency treatment was given and an X ray taken, which showed a fracture of the third, fourth, fifth, sixth, seventh and eighth ribs on the left side. There was a lump on the back of her head half the size of her fist. The side of her face near her left eye was severely bruised and swollen, her ankle was tender, the motion in her left arm was limited, the left shoulder and arm were bruised; also her left knee was injured, and her left leg was bruised from the ankle to the hip. She was taped with one inch adhesive tape from her ankle to the hip. The hospital had no room for her and she was removed to her home, where she was unable to lie down. A bed was devised for her consisting of two chairs, on one of which she placed her feet. She remained sitting upright in the chair, supported by pillows, for three weeks, during which time she was unable to move. Thereafter she was able to lie down for a few minutes, then for a longer time, and perhaps two months after her injuries she was able to lie in bed. She was in pain during this time and could not rest comfortably in any position and was given a lot of sedatives. During this time she complained of pain in her left shoulder, left side and ankle, so much so that on February 19 she was taken to the hospital for additional X rays. These disclosed no further bone fractures. An X ray of the soft parts of her body showed that the left kidney and spleen were enlarged and had been forced downward by the blow. Both could be felt and moved with the fingers of the examining physician. Her condition was such that for the first four months after her injuries her doctor called upon her practically every day, and since then at less frequent intervals. The trial occurred about sixteen months after her injuries. A few days prior thereto she was examined by a neuropsychiatrist, who had been employed by the government in that capacity for more than 28 years and whose ability and qualifications were not questioned. He found her fairly well nourished, unsteady in her gait, and that she limped considerably in her left leg; found a little dent in her skull; that she had anesthesia in her arm above the elbow and forearm; the grip of the left hand was weak, the left leg markedly swollen due to

phlebitis, also the left knee. She complained of a painful left breast and left knee and weakness of the entire left side of her body, and that she had not been sleeping well; that she would get dizzy and could not walk straight. She also complained of severe headaches in the back of her head and pains at times over her left eye. Her blood pressure on the left side showed systolic 170, diastolic 110. This latter was about 40 above normal, indicating an involved kidney, which the doctor thought undoubtedly was the case, and that the blood pressure would get worse regardless of what method might be used to keep it down. Her left arm, leg and side were partially paralyzed, which was the result of a brain injury. She was unable to walk a straight line, was dizzy, droopy and unable to coördinate. She was emotional, cried easily, was very nervous and apprehensive, and tired out. She is an aged woman. There is evidence that she had lost thirty pounds, that she is unable to drive a car and afraid to ride in one; that she is suffering post-traumatic neurosis.

Two physicians who were not neurologists were called by defendant. Their testimony tended to weaken somewhat that of the physician called by plaintiff. Of course the weight to be given to this evidence was for the jury. There was other evidence that plaintiff's nature and disposition had entirely changed from that of an active, intelligent, industrious woman to one who was unable to take interest in any of her former activities or pursuits, unable to attempt to work as long even as thirty minutes without having to lie down. Respecting the amount of recovery, if any, the court gave instructions as follows:

"If you find that the defendant [plaintiff] is entitled to recover damages for personal injuries, then the measure of her damage is what is denominated 'compensatory damages'; that is, such damages as will fully compensate her for the injuries sustained; and in estimating the amount of plaintiff's recovery, you are instructed that, subject to the restrictions and limitations herein laid down, you are at liberty to consider her health and physical condition just before the injury complained of, as compared with her present condition, so far as her present condition is the natural and proximate result of and in consequence of such injuries.

"You may consider the pain and suffering, if any, to which the plaintiff was subjected by reason of and as a result of such injuries, as well as any pain and suffering or disability which the plaintiff may be subjected to in the future as a result of such injuries, and you should carefully consider the probable period of time and extent the plaintiff may suffer pain, discomfort or disability in the future as a result of such injuries, together with any

medical bills which you find plaintiff has incurred or may hereafter incur as a result of such injuries.

"After considering the evidence and being guided by all the instruction herein given, you may allow the plaintiff such damages as in your opinion will be a fair and full compensation for such personal injuries sustained, . . ."

Defendant made no complaint of these instructions. We are unable to see any reason to question them or to disturb the verdict of the jury as to the plaintiff's pain and suffering and as to her permanent injuries, which were approved by the trial court.

The jury allowed plaintiff $1,760 for "medical expenses, including hospital and doctor fees." Appellant contends this amount is not supported by the evidence. The point is well taken. There was testimony that the reasonable service of the doctor who had treated plaintiff from the time of her injuries to the trial was $500. Later in the trial it was stipulated that in addition to the medical expenses previously shown the plaintiff had incurred various miscellaneous items aggregating $76 for medical, hospital or ambulance service. This is the only specific evidence we find in the record respecting the amount of medical expenses, including hospital and doctor fees. The trial court instructed the jury that if it found for plaintiff it could include in its verdict "any medical bills which you find plaintiff has incurred or may hereafter incur as a result of such injuries." The only evidence in the record with respect to further medical attention was given by plaintiff's physician witness as follows:

"Q. Is there any need of any further medical attention from time to time? A. Well she will require medical and she will ask for medical attention and counsel in the future because she isn't well.

"Q. Do you have anything upon which you could base an estimate of what her medical care will cost her in the future? A. Well I would put it this way probably; she will—like she has in the past when I don't call on her regularly—she will call up and tell me her symptoms and like I do with all patients, I tell her what to do and things of that kind and probably will have to see her once a month or something like that, but that's going to be entirely up to her you know. I have been away myself for awhile and when I came back she had called and I have been out to see her several times since I came back. That has been about a month ago and I think that I will probably not go out only just as she feels she wants to see me or consult me."

This appears to go no further than consultation and advice from time to time. This and other evidence in the record tends to show

that plaintiff's condition had become somewhat static, that in fact there had been but little change in her condition for several months prior to the trial, and that there was no likelihood of there being much change, except that the pain in the left shoulder would perhaps become less while the blood pressure and kidney involvement would perhaps become worse, and that rest, not only at night, but an hour or two in the morning and an hour or two in the afternoon would accomplish her greatest help. No other hospital or surgical treatment was suggested as being beneficial. The testimony of her physician, above quoted, appears too meager as a basis of any substantial allowance for future medical attention, and falls more properly within the class of permanent injuries. The result is that the allowance for this item should be reduced to $576.

Industrious counsel have cited a number of our cases and a few from other jurisdictions pertaining to the amount of allowance in personal injury cases. We have examined each of these cases. It would serve no useful purpose to set them out. Each rested upon its own facts. Some of them were decided when the purchasing power of a dollar was much greater than it is now.

The result is that the judgment of the court below should be modified by reducing it $1,184, and as so modified should be affirmed. It is so ordered.