No. 34,001

Margaret Helen Tovey, *Appellant*, v. Lennie Belle Geiser et al., *Appellees*.

(92 P. 2d 3)

Opinion filed July 8, 1939.

*Ben F. Winchel,* of Osawatomie, for the appellant.

*R. E. Coughlin, Edward H. Coughlin,* both of Paola, *O. L. O'Brien* and *Walter L. McVey,* both of Independence, for the appellees.

The opinion of the court was delivered by

DAWSON, C. J.: Leon Arthur Preston and Faye Vandaveer Preston, husband and wife, died of asphyxiation in their home in Osawatomie on December 6 or 7, 1936. They left no children or other descendants. Mrs. Preston died intestate. Mr. Preston left a will executed before his marriage. By its terms he devised all his property to the appellant, Margaret Helen Tovey.

That his subsequent marriage to Mrs. Preston had the legal effect of reducing by one-half the extent of Mrs. Tovey's interest in Mr. Preston's estate, if Mrs. Preston survived her husband, is not controverted.

Both husband and wife owned certain property in their individual names. They also held title to certain property in common, and both held insurance policies naming each other as beneficiaries.

The devolution of these properties to the heirs of the husband or of the wife depends on whether the husband or wife died first; and to secure an adjudication of that question was the purpose of this lawsuit.

Plaintiff claimed that Preston survived his wife. The defendants as heirs of Mrs. Preston claimed that she outlived her husband.

This issue was properly joined by pleadings, and the cause was tried before a jury which returned the following verdict:

"We, the jury empaneled and sworn in the above-entitled case, do, upon our oaths, find that Leon Arthur Preston, the husband, died *before* the time of the death of Faye Vandaveer Preston, the wife."

At the same time the jury returned an answer to a special question thus:

"[Question]: If you find that Leon Arthur Preston died *before* Faye Vandaveer Preston died, you will please state your reasons or grounds for so finding. A. Health, age, sex, and accustomed to gas."

Judgment was accordingly entered, decreeing that plaintiff Margaret Helen Tovey took an undivided one-half of Leon Arthur Preston's property by virtue of his will, and that as Faye Vandaveer Preston, his wife, survived him she took the other undivided one-half as his statutory heir; and that upon her death the same passed with all the rest of her individual property to her heirs, defendants herein.

Plaintiff appeals, not contending against the trial court's finding and judgment that she had failed to establish her own cause of action, but contending that there was not sufficient competent evidence to establish defendants' cross action—that Mrs. Preston had survived her husband.

Following the argument of appellant's counsel, it is first contended that the jury's finding that the husband died before his wife was "almost wholly the result of guesswork, surmise and mere conjecture."

To a correct determination of this and other matters urged on our attention certain undisputed or well-established facts are required to be stated. Mr. and Mrs. Preston lived in a five-room, one-story house. It had no basement, but was heated by gas piped to two floor furnaces under the house. There was a vent pipe connected with the furnaces intended to carry off noxious gases. Three rooms, a kitchen, dining room, and parlor, were in line from north to south, and on the west were two bedrooms with a bathroom between them. In the dining room, which also served as a sitting room, and which was situated between the kitchen on the north and the parlor on the south, stood a sofa or davenport against its west wall. There was virtually no partition between the middle room and the parlor. In the floor near the west sides of these two rooms, and about the division line between them, was a floor register, with a burner below, which heated both rooms. In the parlor to the south of this floor register was an overstuffed chair. The south end of the davenport standing against the west wall of the dining room was at some slightly greater distance from the floor register than the overstuffed chair in the parlor. Doors connected the two bedrooms with the dining room and parlor. There was an outside door on the north in the kitchen and an outside door on the south side of the parlor. There were windows on the east sides of the dining room and the parlor.

On December 6, 1936, the weather was very cold, and a strong wind was blowing from the north. Mr. and Mrs. Preston had planned to go to Neodesha to visit Mrs. Preston's sister in the evening of that day. They did not come, and telephone calls failed to reach them that evening or the next morning. This prompted Mrs. Preston's sister in Neodesha to call the city officials of Osawatomie. The chief of police, accompanied by a Mr. Samuels, went to the Preston home. All the doors were locked. They broke a glass panel in the enclosed porch on the north, unbolted a door and entered.

The whole house was suffocatingly hot. Fires were burning in all four of the burners of the kitchen range, both floor register burners were lighted and so, too, was a burner in the bathroom.

Passing from the kitchen to the dining room, the chief of police and Mr. Samuels saw Mrs. Preston sitting almost erect on the davenport at its south end near the floor register between the two rooms. She was dead, but her body was still slightly warm. Next they noticed Mr. Preston lying on the floor on his left side. His face was about four or five inches from the south edge of the floor register, and the top of his head about twelve inches east of its west edge. He, too, was dead, and his body felt cooler than that of Mrs. Preston.

On further investigation the chief of police and the county coroner found that there were no regulators for the floor furnaces, but there was a vent pipe which extended under the floor and passed through the east foundation wall and which was designed to furnish an outlet for any noxious fumes generated by the gas burners. It was discovered that this vent pipe was choked and frozen with ice and snow—a fact which quite clearly revealed the cause of the fatal tragedy which befell the occupants of the house.

The county coroner, who was also a physician and who had much experience in cases of carbon monoxide poisoning, testified that he reached the Preston home in the forenoon of December 7, 1936; that on investigation he concluded that an inquest was not necessary; that the cause of the deaths of Mr. and Mrs. Preston was asphyxiation from carbon monoxide gas; and that "they had been dead approximately eighteen hours or maybe a little longer."

A fact of some probative value was that a very hard wind was blowing from the north on December 6 and 7, 1936. Whatever draft penetrated the house would tend to deflect the noxious gases and fumes in the house toward the south, past where Mrs. Preston sat, and towards her husband who was south of the floor register from which some of the poisonous fumes must have issued.

There was circumstantial evidence which tended to show that her husband had been sitting in the overstuffed chair near to the floor register, but south of it. Apparently he had vomited before he slipped or fell from this chair, because there was vomit on the chair and on the sleeve of his shirt.

An expert witness, whose qualifications were well established, was asked to assume as true the *locus in quo,* the positions and relative proximity of the husband and wife to the floor register, the stiff north

wind, the doors, windows and other pertinent matters shown in evidence, and then questioned:

[Question]: With that situation, if gas was coming out of this furnace grate, would there be any deflection of the gas in that room from one direction to another? A. There would be some deflection, in the direction the wind is blowing.

"Q. From the direction the wind is blowing to the opposite direction? A. Yes, sir.

"Q. What would you say as to whether or not the presence of that draft would affect the probable concentration of the monoxide gas in that room in relation to the two subjects that were there breathing it. A. The one on the side . . . from which the drafts were coming from, would have the advantage.

"Q. The one on the north would have the advantage? A. If the drafts were coming from the north, the one sitting on the north would have the advantage."

One feature of the evidence which tended to show whether the husband or wife died first was the comparative condition of their health. Mr. Preston was 47 years of age and had followed the occupation of a railway freight train conductor and brakeman, but had been retired from active service on account of ill-health. For several years he had been forced to go back and forth to the railway hospital at St. Louis for occasional treatment and examination. He took medicine three times a day and breathed heavily whenever he walked or took any exercise. He had suffered one paralytic stroke on the right side of his body, one of his feet dragged, and he required a lot of rest. His entire physical, nervous and circulatory system had been weakened by syphilis, of which disease he was in the tertiary stage. His red-blood count was below normal, hemoglobin 82 percent. Medical and scientific experts testified that a man in such condition would lack normal resistance to monoxide poisoning. One pathologist of many years' experience testified:

"A man may have syphilis and have a damaged heart and when under those circumstances he contacted carbon monoxide, that his blood will pick up carbon monoxide just as quickly as anybody else's. But what I am trying to say to the court is this, that when it comes to the response of weakened organs, under those circumstances, that you can certainly expect a man with weakened organs to succumb quicker than a perfectly normal individual. And, furthermore, I would like to emphasize again my answer, that a person who has had syphilis for a number of years is not a normal individual."

Another expert, who had long conducted his own laboratory and was frequently employed to do clinical and other scientific work for physicians, testified:

"Carbon monoxide would be 96 hundreths—just a fraction lighter than air. . . .

"Carbon monoxide combines with the hemoglobin of the blood. The greater the concentration, the more rapidly the formation of carbon monoxide hemoglobin."

"CO is the symbol for carbon monoxide. One part CO to ten thousand parts of air put 16.7 parts hemoglobin out of use. Two parts CO to 10,000 parts of air puts 28.5 hemoglobin out of use, and it increases until they get down to ten parts CO to 10,000 parts of air puts 67 percent of hemoglobin out of use. It increases the concentration. The result of the increased concentration is an increased percentage of the hemoglobin made functionless or, in other words, put out of use. That is, most of the authorities agree that 70 percent saturation of the hemoglobin of the blood would produce death."

Contrasting Mrs. Preston's condition of health with that of her husband, she was 43 years of age and weighed between 150 and 160 pounds. The evidence tended to show that she was a robust, healthy woman, never known to be sick, active and quick in her movements, did her own housework and ready to help with the work when she visited with her mother, ready to go "anywhere on a picnic or swim, she was a great hand to swim."

There was some testimony that however well-regulated gas burners for domestic use may be there is some escape of carbon monoxide gas, but that a housewife and cook develops a certain resistance to its evil effects. One doctor testified:

"That he had had experience in the treatment and observation of persons subjected to poisonous gases; that the history of the former physical condition and health of Mr. and Mrs. Preston would in his opinion render Mr. Preston the less resistant to the effects of monoxide gas poisoning; that exposure to atmosphere containing monoxide gas has a tendency to immunize the person so exposed from its effects, and that Mrs. Preston, being the wife in the home where the cooking was done upon a gas range, was subject to that degree of immunization.

.   .   .   .  .   .   .   .   .   .   .   .   .   .   .   .   .

"It is generally conceded by medical authorities that a slight exposure to carbon monoxide over any period of time—a reasonable period of time— allows that individual to build up an immunity to carbon monoxide gas poisoning."

There was also some testimony that a woman's chest capacity, being less than a man's, (which was the fact in this case), she would breathe into her lungs a less quantity of monoxide gas at each respiration and its deadly effect would thereby be delayed. To a hypothetical question formulated to include the questioner's summary of the evidential facts and circumstances, one expert, Dr. B. L. Phillips, testified:

"I think he [Mr. Preston] would die quicker under the exposure to the carbon monoxide poisoning—other conditions being fairly equal.

"Q. Would you say whether or not a man in that condition—in the condition I have assumed—would be more or would be less susceptible to monoxide poisoning than an ordinarily healthy, robust individual? A. He would be more susceptible.

. . . . . . . . . . . . .

"A. Under those conditions, as you have outlined there, I would expect the woman to survive."

Another expert, Dr. William K. Trimble, answered a similar hypothetical question:

"I would like to give it as an opinion that in consideration after considering the location of the grates, from which I assume this gas came, that the position of the man would very probably give him a greater concentration of the carbon monoxide than would be obtained by the second party, who was seated a further distance from the grate and also in a position where there was a greater amount of the ventilation due to open doors.

"Q. Then, do I understand it would be your opinion that the woman, or the second party as you call it, survived the man who was lying on the floor?

"[Counsel for plaintiff]: I object to that as calling for opinion and conclusion evidence and evading [invading] the province of the jury.

"The Court: Overruled.

"A. I would think that under the circumstances she would be entitled to survive longer than the man."

Foundation was properly laid for the introduction of excerpts from a Public Health Bulletin issued by the United States government on "Review of Carbon Monoxide Poisoning." It read:

"Men who had any inherent weakness of the nervous system were also more susceptible to CO [carbon monoxide]."

From a treatise of another recognized authority, Doctor Sayers, the following excerpt was introduced:

"Anything that lowers the physical fitness of a man, such as illness, overwork or excesses of any kind, exaggerates the effects [of carbon monoxide]."

From a medical textbook by Professor Ralph W. Webster, of Rush Medical College, the following was read to the jury:

"In cases of death from breathing asphyxiating gases, it is generally considered that the female consumes less oxygen than the man and therefore the presumption of survivorship is in favor of the female."

It would serve no useful purpose to glean more minutely from the record other incidents of fact or opinion of some probative force. What we have summarized above did, in our opinion, constitute sufficient evidence to take the case to the jury.

Turning next to other objections to the judgment, appellant argues that defendants' expert witnesses testified "wholly and entirely from a hypothetical standpoint." Quite true, but it is not contended that the hypothetical questions on which their professional opinions were elicited were not formulated on the undisputed facts and circumstances, together with the other evidence for the truth of which the questioner vouched. Hypothetical questions so formulated are competent and the answers given thereto by scientific and medical experts, if given credence, have some probative value. (*Bell v. Newkirk,* 136 Kan. 111, 12 P. 2d 733.) Appellant cites 17 C. J. 1181 to the effect that opinion evidence is not admissible upon the question of survivorship among persons who perish in the same calamity. But the same authority also has this to say:

"Where there is no direct evidence as to which of two persons survived a common disaster, circumstantial evidence, including such general considerations as age, health, nature of injuries, etc., may be considered, especially where expert opinion has been given that consideration of these matters is material in determining the survivorship. Inference from such circumstantial evidence is not the same thing as a presumption in the absence of all evidence. But where there is any evidence as to the survivorship between two persons who perished in a common disaster, it must govern in the decision of the fact." (17 C. J. 1180.)

Moreover, we have some precedents of our own to guide us on this subject. In *Noller v. Aetna Life Ins. Co.,* 142 Kan. 35, 46 P. 2d 22, which followed the violent deaths of Mr. and Mrs. Dan Hammat who had been shot to death in their bedroom, the litigation was to determine which died first. We held that this controverted issue could be determined by a jury upon sufficient circumstantial evidence. No reason can be suggested why the opinions of competent experts should be excluded in such a case when it is the best that can be had, and where direct and positive evidence does not exist. (*Monroe v. Lattin,* 25 Kan. 351, syl. ¶ 2; *Root v. Packing Co.,* 88 Kan. 413, 129 Pac. 147, syl. ¶ 1.) In *Telephone Co. v. Vandevort,* 67 Kan. 269, 270, 72 Pac. 771, it was said:

"The general rule is that opinion evidence may be received where it is the best that can be had, or where the situation, facts and events cannot be adequately reproduced or described to the jury . . ."

While the ordinary rule of evidence is that witnesses should not be permitted to testify to the ultimate facts which it is the province of the jury itself to decide, that rule is not strictly applied when the opinions of experts are offered to aid the jury in reaching its de-

cision. (*Sillix v. Armour & Co.*, 99 Kan. 103, 109, 160 Pac. 1021; *Malone v. New York Life Ins. Co.*, 148 Kan. 555, 557, 83 P. 2d 639.) A case much like the one we are considering was *Estate of Butt*, 181 Wis. 141, 193 N. W. 988, where a husband and wife and their two children and the wife's brother slept in a room with windows and door tightly shut and with no provision for ventilation. They were all found dead. The cause was monoxide gas generated in the hard-coal furnace in the basement of their house which came through the hot-air register or through cracks in the door. The lawsuit which followed was to determine whether the husband and father survived his family or that they or one of them survived him. In the nature of the case, the evidence consisted of the circumstances, the size of the room, the location of the entry of the poisonous gas, the location of the bed, the position of the bodies, the age of the decedents, together with their physical conditions. The trial court rejected the testimony of experts offered to show the effects of monoxide gas on different persons, and the probable currents of air following the heat that came from the floor register. The supreme court held that such evidence was proper, and that in the nature of the case none but experts could know the effect of monoxide gas on the human system, or how it would affect different persons under different circumstances. The syllabus, in part, reads:

"Evidence of those persons who by reason of special study and experience possess knowledge and judgment not possessed by mankind in general cannot be ignored.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Where several persons were asphyxiated in a small room heated with a hot-air register connected with a hard-coal furnace, the effects of monoxide gas on different persons when inhaled, its relative weight and its diffusion with the air, and the probable currents of air following the heat that came from the hot-air register, were properly matters of expert testimony.

"A husband, his wife, and their children were asphyxiated by monoxide gas, and the evidence of experts was substantially to the effect that the wife survived her husband. *Held,* the evidence being substantially all one way, it was the duty of the trial court to find accordingly." (Syl. ¶¶ 2, 4, 5.)

See, also, *New York Life Ins. Co. v. Doerksen*, 64 F. 2d 240, and wealth of cases cited in 13 Fourth Dec. Dig. 1309-1312.

In 3 Chamberlayne's Modern Law of Evidence it is said:

"An expert may be said to be a skilled witness who testifies upon the basis of assumed facts stated in a hypothetical question. . . . In a sense, the field of the expert is a narrow one. It relates primarily to pure intellect, mere reasoning. In another sense, it is extremely broad, embracing all forms of

human knowledge or experience which can fairly be presumed by a presiding judge to be beyond, or at least outside of, the thinking of ordinary men." (§ 2374.)

In the same treatise it is said:

"In case of the expert, however, the inadequacy which the witness is to supply is in the *reasoning* powers of the jury. No man can satisfactorily reason about that which he does not understand. In a matter of art, science or trade, subjects beyond the common knowledge of the jury, the necessary data for sound reasoning and the faculties for producing it may both be unknown or undeveloped. Should this inadequacy be made clearly apparent, the judgment of the expert will be received.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"*Protecting the province of the jury.*—Upon ordinary principles, the court, in seeking to protect the function of the jury, will exclude the judgment of an expert which involves only acts of plain and simple reasoning which the jurors could properly draw for themselves.    .    .    .

"On the other hand, should the adequate necessity for receiving the evidence be shown, the judgment of the expert may be admitted upon the precise point as to which the jury are to pass." (§ 2377.)

In 2 Jones on Evidence, 4th ed., section 367, it is said that the tendency of judicial opinion "is toward the extension of the field of admissibility of expert testimony which is based upon established or generally recognized scientific principles or discoveries." And in the same volume, section 392, it is said:

"Furthermore, there is a class of cases holding that in some circumstances expert testimony is of great value;    .    .    .    much weight may attach to the testimony where skilled and experienced experts give their opinions based wholly or in part upon facts which have come under their own observation, or where they state precise facts of science, as ascertained and settled, or the necessary and invariable conclusion which results from the facts stated; and it not infrequently happens that such opinions are indispensable in furnishing some guide for the determination of questions unfamiliar to ordinary witnesses. In some instances the statements of experts have been accorded a weight overcoming direct testimony to the contrary."

See, also, same text, section 373; and 4 Wigmore on Evidence, 2d ed., 115-117.

Applying these modern and progressive views of the law of evidence to the questions asked of Doctor Trimble, and the doctor's answer thereto, it will be seen that prejudicial error cannot be predicated thereon. Moreover, Doctor Trimble and other experts had given other testimony against which no technical objection was or could be raised, consequently the particular question objected to only elicited cumulative testimony. In 5 Encyclopedia of Evidence, 649, it is said:

"Error in the admission of expert testimony may not be ground for reversal where such testimony is merely cumulative, and there is an abundance of other evidence which is competent and which sustains the opinion of the witness. . . ."

The other matters urged against the judgment have all been carefully considered, but none of them appears to be of sufficient gravity to warrant discussion. Appellant calls our attention to the fact that after the jury had deliberated on their verdict for some time they sent a request to the court, "Give us a full meaning of simultaneously." In response, the court sent to the jury the following as an amendment to its instructions:

"Members of the Jury: The word 'simultaneous' (as used in paragraph 10 of the instructions, and the word 'simultaneously' (as used in form C of the verdicts) have the same meaning, and they both mean: 'Happening at the same time.' (Signed)   G. A. ROBERDS. Judge."

Appellant says that the court's definition "was perhaps correct," but that the instruction in which it was included was itself erroneous. As the instructions are not submitted for our perusal we cannot rule on that point. It is also asserted in appellant's brief that the jury's request for a definition and the court's response thereto occurred in the absence of plaintiff and her attorney. Counsel for appellees do not admit this to be the fact. They say, "The record is silent as to whether plaintiff's counsel was present or absent, and being silent, it will be presumed that he was present. (*Joseph v. National Bank,* 17 Kan. 256.)" Mayhap this is a sufficient answer. Another would be that the matter was not squarely raised in the motion for a new trial, so it is not reviewable now. Furthermore, the incident itself being so trivial and no prejudice being shown, no material error could be made out of it. (See *State v. Jones,* 137 Kan. 273, 20 P. 2d 514, syl. ¶ 3.)

Finally the complaint is made that—

"After the jury had been kept out five full days and one night, they were brought into the jury room and the court proceeded to deliver a highly prejudicial lecture and reprimand to the jury for not having arrived at a verdict."

This is contradicted by counsel for appellees. The only record on the subject is a statement of the occurrence by the trial judge, which would scarcely justify any criticism. Moreover, the judge's remarks occurred in the presence of counsel for both parties. Neither objected to them. And we can only repeat what we have so often said, that it serves no purpose to complain to this court of an incident which occurred in the trial court which counsel regarded as so incon-

sequential that they interposed no objection. (*American Automobile Ins. Co. v. Clark*, 122 Kan. 445, 252 Pac. 215; *Hill v. Southern Kansas Stage Lines Co.*, 143 Kan. 44, 54, 53 P. 2d 923; *State v. Pyle*, 143 Kan. 772, 781-782, 57 P. 2d 93.)

The judgment is affirmed.