STATE of North Dakota, Plaintiff and
Respondent,

v.

Larry Duane CARROLL, Defendant and
Appellant.

Cr. 311.

Supreme Court of North Dakota.

Aug. 30, 1963.

Rehearing Denied Oct. 18, 1963.

Lyche, Lyche & Camrud, Grand Forks, for defendant and appellant.

Helgi Johanneson, Atty. Gen., Bismarck, and James H. O'Keefe, State's Atty., Grafton, for plaintiff and respondent.

ERICKSTAD, Judge.

The defendant, Larry Duane Carroll, was found by a Walsh County jury on July 13, 1961, to be guilty of the crime of arson of a building other than a dwelling, contrary to Section 12–34–02, North Dakota Century Code.

On behalf of the defendant, his attorney, James E. Leo, filed on October 16, 1961, with the Clerk of the District Court of Walsh County a motion for a new trial, alleging that the verdict was contrary to law and clearly against the evidence. This motion was duly heard, and an order denying same was entered on January 20, 1962.

Thereafter the defendant secured the services of the law firm of Lyche, Lyche & Camrud, who filed with the aforesaid clerk of court on February 8, 1962, a notice of motion for a vacation of the verdict, for a new trial, and for a delay in entering the judgment and sentence.

After a hearing of the said motion, the District Court, on March 8, 1962, entered an order denying the motion.

Notice of appeal, filed with the clerk of the said court on March 14, 1962, states that the appeal to the Supreme Court is from the whole of that certain final judgment of conviction and sentence rendered by the said court and entered and docketed on the 14th day of March, 1962, and that the appeal is also from the whole of that certain order made and entered in said action by the said court, dated the 20th day of January, 1962, which denied a motion for new trial, and that the appeal is from a similar order dated March 8, 1962.

The judgment appealed from is actually an order, suspending the imposition of sentence for a period of five years, pursuant to Chapter 12–53, North Dakota Century Code.

An examination of the order indicates that the trial court invoked Section 12–53–13 of the North Dakota Century Code. The said section reads as follows:

"12–53–13. Imposition of sentence suspended—When authorized.—When a defendant has been found guilty of a crime, whether or not for the first time, excepting the crimes mentioned in section 12–53–02, the court having jurisdiction thereof, including a county justice, upon application or its own motion may, in its discretion, suspend the imposing of the sentence and may direct that such suspension continue for a definite period of time, not exceeding five years, and upon such terms and conditions as it may determine."

In this connection, an annotation in American Law Reports has this to say:

"It is ordinarily required that a judgment or order, to be appealable, must be final. In this connection it is said generally in 2 Am.Jur. 934, Appeal and Error, Sec. 140: 'In criminal prosecutions the same policy with respect to review prevails as in other cases, and as a general rule, a judgment, to be reviewable, must be final. With reference to what satisfies the requirement of finality, it may be stated generally that no judgment will be regarded as final unless sentence is pronounced.'

"In the more recent decisions discussing the question under annotation a distinction is made between the suspension of the imposition of sentence and the suspension of the execution of sentence, the cases generally holding that if the imposition of sentence is suspended there is no sentence, and hence no final judgment from which an appeal may be taken, while on the other hand, if the sentence is imposed but the execution thereof is suspended, the suspension of the execution of sentence does not affect the finality of the sentence or judgment, and the defendant may appeal. * * *" 126 A.L.R. 1210.

The note further states:

"Ordinarily, an order suspending the imposition of sentence is not regarded as a final decision from which an appeal will lie. Thus, where the appellate jurisdiction of the Federal Circuit Court of Appeals is generally limited to a review of 'final decisions' of the district courts, it was held, in Birnbaum v. United States (CCA 4th) [107 F.2d 885, 126 A.L.R. 1207] * * * that 'an order suspending (the imposition of) sentence and releasing a prisoner on probation is in no sense a final decision. It is the mere deferring of sentence, which in a criminal case is the final judgment.' It was argued that an order suspending the imposition of sentence and admitting one convicted of crime to probation was in effect a sentence disposing of the case, but the court replied that in such cases the court can pronounce sentence at any time during the period of probation, and hence such order of suspension was not a final order. The court added that if the defendant objected to probation and desired a sentence from which he could appeal, all he had to do was to ask that sentence be imposed." 126 A.L.R. 1211.

Our legislature has specifically designated from what a defendant in a criminal case may appeal:

"From what defendant may appeal.— An appeal may be taken by the defendant from:

"1. A final judgment of conviction;

"2. An order refusing a motion in arrest of judgment;

"3. An order denying a motion for a new trial; or

"4. An order made after judgment affecting any substantial right of the party."

Sec. 29–28–06, N.D.C.C.

Where the provisions of our Code relating to the suspension of the imposition of sentence have been resorted to, the trial court could, in its discretion, set aside the verdict of guilty and could, further, dismiss the information against the defendant; and, if this were done, a final judgment of conviction would never be entered.

"Records on discharge from probation.—Every defendant who has fulfilled the conditions of his probation for the entire period thereof, or who shall have been discharged from probation prior to the termination of the period thereof, may at any time be permitted in the discretion of the court to withdraw his plea of guilty, the court may in its discretion set aside the verdict of guilty; and in either case, the court may dismiss the information or indictment against such defendant, who shall then be released from all penalties and disabilities resulting from the offense or crime of which he has been convicted. The clerk of the district court shall file all papers, including the findings and final orders in proceedings had hereunder and shall note the date of filing on the papers. The records and papers shall be subject to examination by said clerk, the judges of the court, the juvenile commissioner, and the state's attorney. Others may examine such records and papers only upon the written order of one of the district judges." Sec. 12–53–18, N.D. C.C.

In the instant case no sentence has been imposed, and, under the provisions of our law relating to the suspension of imposition of sentence, it is possible that a sentence may never be imposed.

In a California case decided in 1939, it was held that an order granting probation without the imposition of judgment and sentence was not an appealable order. People v. Smith, 36 Cal.App.2d 361, 97 P.2d 867.

In another California case decided in 1941, in a special concurring opinion, it was said:

"* * * It seems well settled, however, that where a defendant is ordered on probation by suspending the imposition of sentence, no appeal lies in the absence of a statute expressly authorizing such an appeal; but on the other hand, where a defendant is ordered on probation by imposing sentence and suspending the execution thereof, an appeal does lie. * * *" In re Phillips, 17 Cal.2d 55, 109 P.2d 344, 132 A.L.R. 644.

The United States Supreme Court, in a case decided in 1943, has overruled Birnbaum v. United States, supra, cited earlier in American Law reports notes (126 A.L.R. 1211). Korematsu v. United States, 319 U.S. 432, 63 S.Ct. 1124, 87 L.Ed. 1497.

An interesting commentary, however, on the latter case is contained in the case of State v. Gates, 230 Or. 84, 368 P.2d 605.

"There is no apparent reason for rejecting our own rulings that when a court suspends the pronouncement of sentence, the judicial process 'remains in a state of suspense.' Anderson v. Alexander, supra [191 Or. 409, 229 P.2d 633]. Being in suspense, there would normally be no final judgment and no right of appeal. Of course the legislature may grant an appeal from even a judgment 'in suspense' if it so desires. When after a plea of guilty, no sentence is pronounced, the statute indicates no such desire. Even if we should adopt the reasoning of Korematsu v. United States, 319 U.S. 432, 63 S.Ct. 1124, 87 L.Ed. 1497, we would still be compelled to hold that even if probation is an 'authorized mode of mild and ambulatory punishment' we could not say that the order of probation is appealable by one who pleaded guilty and where imposition of sentence was suspended and probation

granted. A mild and ambulatory punishment could not be called excessive, cruel or unusual and it would be preposterous to hold that such a 'punishment,' if such it be, could be appealable under the limitations of ORS 138.050." State v. Gates, 230 Or. 84, 368 P.2d 605.

■ Similarly, a study of our statute causes us to conclude that an order suspending the imposition of sentence, pursuant to Section 12–53–13, N.D.C.C., is neither an order nor a final judgment of conviction from which an appeal may be taken.

■ Although the defendant cannot appeal from the order suspending the imposition of sentence, under the provisions of Section 29–24–02 of the North Dakota Century Code, the defendant is entitled to make a motion for a new trial; and, as an order denying such a motion is appealable, the specifications of error asserted by the defendant will be reviewed by this court in the defendant's appeal from the two orders denying the motions for new trial.

Subsection 5 of Section 29–24–02 of the North Dakota Century Code permits the trial court to grant a new trial:

"When the court has misdirected the jurors in a matter of law, or has erred in the decision of any question of law arising during the course of the trial, or has done or allowed any act in the action prejudicial to the substantial rights of the defendants;".

Subsection 6 of Section 29–24–02 of the North Dakota Century Code permits the trial court to grant a new trial:

"When the verdict is contrary to law or clearly against the evidence;".

In this case only the State presented testimony. The defendant himself did not testify, nor was any evidence submitted on his behalf. The defendant's counsel made no closing argument to the jury.

The State presented its case through thirteen witnesses.

The first witness called was Richard Caseman, who testified that he is a member of the Fordville Volunteer Fire Department; that in answer to a call sounded from the Fordville fire siren he went to the Victor Petulney farm on February 18, 1961; that this farm is about a mile from Fordville; that when he arrived there, a potato warehouse was on fire; that the fire was in front of the door; that others were at the scene ahead of him; that after the fire was put out, he and others went inside the warehouse and into the lower part, where he found some potato sacks burning on a platform; that part of the floor had been burned; and that part of the west wall of one bin had been burned.

He also testified that he saw a Nipco heater (kerosene or diesel fuel burning air heater), two blowers, and some burned sacks, which items were taken out of the warehouse.

Mr. Ernest Larson, manager of the Robertson Lumber Company of Fordville and Assistant Fire Chief, who was the second witness called, merely corroborated a part of the testimony of Richard Caseman.

The third witness, Mr. Lynn Robertson, another volunteer fireman, further corroborated a part of the Caseman testimony.

The fourth witness, Mr. Victor Petulney, lived on a farm owned by his father, Mr. Martin Petulney. He testified that on this farm was situated the warehouse which he rented to the defendant in the fall of the year 1961 for one hundred dollars, that it had not been used for ten years prior thereto and needed a little repair, and that the storage capacity was between ten and eleven thousand bushels.

He further testified that he saw his hired man, Mr. Raymond Pecka, and the defendant, Larry Duane Carroll, at the warehouse, as he drove by on the road between five and six o'clock in the evening of February 17, 1961, and that he, Petulney, was away for the evening and returned around twelve o'clock.

He also said that there was a crack in the wall of the warehouse and that his own potatoes had frozen in the warehouse when he had previously used it.

Mr. Edward Beets, the fifth witness, an insurance salesman, testified that he sold the defendant insurance on the potatoes stored in the warehouse. He did not remember the amount of potatoes the defendant informed him were in the warehouse, but said that they agreed on $12,000 as the amount of insurance and that the date of the policy was January 21, which date was apparently in the month preceding the fire over which this case arises. He made no examination of the potatoes prior to the issuance of the insurance policy.

He further testified that he had had three contacts with the defendant in connection with the insurance and that the first contact was "mutually made," that the second contact or conversation concerning the insurance was at the defendant's farm, and that the third conference or contact, at which the insurance sale was made, was at the insistence of Mrs. Carroll.

Mr. Wesley Sampson, the sixth witness, an electrical contractor, testified that he investigated the wiring at the warehouse in the latter part of February, but was not permitted to testify as to what he found, nor was he permitted to give his opinion as to the cause of the fire.

The seventh witness, Mr. Adolph Houser, testified that he lived on the Victor Petulney farm; that he was hired by the defendant in December, 1960; that he worked for the defendant in the warehouse leased by the defendant until February 10, 1961; that his work consisted partially of starting a heater every morning "to dry up" the warehouse; that on the morning of February 18, 1961, he went to the warehouse and found both doors open and a fire inside; that he had been at the warehouse between five and six o'clock in the evening of February 17 to check on the temperature in the warehouse; and that empty sacks were found in the alley of the warehouse on the morning of the 18th that were not there on the evening of the 17th.

Mr. Houser further testified that while employed by the defendant, he rode to the City of Park River with the defendant and that on this occasion he asked the defendant if he had found out about insurance. His testimony in that respect is as follows:

"A. Well I asked him if he find out about that insurance, he said yes.

"Q. Was there any further conversation at all regarding insurance?

"A. Then I told him that now that stove can explode.

"Q. What did he say, if anything?

"A. Well, he said yes, and he told me if I make stove explode that he will give me five hundred dollars.

"Q. Did you reply to that?

"A. No. I told him that five hundred dollars would not feed my family if they put me in for four or five years.

"Q. That end of conversation?

"A. Yah, we did not say anything else."

On cross-examination Mr. Houser admitted that he had previously said at the preliminary hearing that the aforesaid conversation was a "joke," but said that he now believed it was not a "joke."

Mr. Houser also said on cross-examination that he did not know the reason he was present at the warehouse on the evening of February 17, although he was there alone when he was no longer employed by the defendant.

On re-direct examination Mr. Houser testified that he was at the warehouse to help the defendant so that the defendant's potatoes would not freeze.

Further admissions by Mr. Houser on cross-examination were that he had had trouble with the defendant about money and

believed that the defendant owed him some money but did not know how much the defendant owed him. On being questioned as to whether he had been drinking that evening, he said: "I don't remember."

Mr. Raymond J. Pecka, the eighth witness called, was an employee of Victor Petulney. He testified that he and the defendant were in the warehouse on the evening of February 17 around 7:45; that while he was there he helped the defendant start the heater; that when he left about one-half hour later the defendant was still there; and that he was called to the warehouse by Adolph Houser on the morning of February 18 and found the warehouse on fire, part of the floor of the warehouse burned, and some potato sacks burning.

On cross-examination Mr. Pecka admitted that it may have been between five and six o'clock when he and the defendant were at the warehouse on the evening of February 17 and that it may have been 6:30 when he left.

Harris Lanes, a potato inspector from Grand Forks, North Dakota, was the ninth witness called. He was asked by the Western Adjustment and Inspection Company of Grand Forks to inspect the potatoes in the warehouse here involved. He testified that on February 28, in company of two associates, he inspected the potatoes in the warehouse and found two lots of potatoes; one lot of 500 sacks; and one lot in bulk of 2,272 hundredweight. The lot in bulk was unclassified (did not meet any grade requirement), with grade defects averaging approximately 55%. He said that the sacked potatoes were also unclassified.

The tenth witness, Mr. Arne Bjornson, a deputy state fire marshal, testified that he made an investigation of the warehouse on February 23, 1961. He also said that on February 24, 1961, he and a photographer from Grafton took certain photographs of the warehouse premises.

Exhibit 3, showing the interior of part of the warehouse, and Exhibit 4, showing the exterior of the warehouse, both identified by Mr. Bjornson, were admitted over the defendant's objections; whereas Exhibit 5, showing the interior of the warehouse, and Exhibit 6, being a photograph of the heater, were admitted without objection.

Mr. Bjornson testified further that the wires in the warehouse were checked and that no short in the wiring was found; that the remains of some sacks that were hung on the walls of the warehouse had an odor similar to fuel oil; that two separate unjoined places of fire were found in the warehouse; and that he took samples of sacks and wood splinters, which he turned over to the State Laboratories Department for examination.

He said that his examination of the heater indicated that it had not exploded.

Through this witness the following exhibits were introduced and admitted into evidence:

Exhibit 7, taken by Mr. Bjornson in the presence of Victor Petulney, consisting of remains of burlap sacks from the west wall of the warehouse, admitted without objection;

Exhibit 8, taken by Mr. Bjornson in the presence of Victor Petulney, consisting of remains of burlap sacks found in the vicinity of the heater, near the entrance of the warehouse, admitted without objection;

Exhibit 9, taken by Mr. Bjornson, consisting of remains of burlap sacks removed from the cribbing in the basement of the warehouse, admitted without objection;

Exhibit 11, taken on February 28 by Mr. Bjornson in the presence of Ernest Grossman and Adolph Houser, consisting of wood splinters from the warehouse, admitted without objection;

Exhibit 12, taken on March 9 by Mr. Bjornson in the presence of Victor Petulney and the State's Attorney, consisting of oil taken from an oil barrel in the warehouse, admitted without objection;

Exhibit 13, taken on February 25 by Mr. Bjornson in the presence of Ernest Larson, the Assistant Fire Chief of Fordville, consisting of parts of burlap sacks, admitted without objection; and

Exhibit 14, taken by Mr. Bjornson, consisting of a cup from a "Thermos" bottle which was found in the warehouse, admitted without objection.

Testimony throughout was to the effect that the aforesaid Exhibits 7, 8, 9, 11, 12, 13, and 14 were turned over to a Mr. Koehler of the State Laboratories Department at Bismarck, North Dakota, for examination.

Mr. Bjornson was not permitted to give his opinion as to the cause of the fire.

The eleventh witness, Mr. Robert M. Werner, an employee of the State Laboratories Department, testified as to tests he performed on certain exhibits. He said that Exhibit 12, which was a liquid taken from the oil barrel in the warehouse, was similar to a liquid found on Exhibit 8, which exhibit consisted of remains of burlap sacks found near the heater in the warehouse. He also said that the liquid was combustible and that it burned with a sooty flame, similar to diesel fuel. No analysis was made of Exhibit 9.

He further testified that he compared certain extracted volatile material from Exhibit 14 with liquid from Exhibit 12 and with other diesel fuel and found "a similarity." He also said that he found a "similarity" between the extracted materials from Exhibits 11, 12, and 13 and other fuel oil in that they were all "combustible." He found the extracted material from all the aforesaid exhibits to be "similar" to diesel fuel.

On cross-examination Mr. Werner would not say that the substances extracted from the exhibits and fuel oil were the same or that they were identical, but he did say that they were "very similar."

The twelfth witness, Mr. Ernest D. Grossman, a special agent for the National Board of Fire Underwriters, who testified that he had examined between three and four thousand fires prior thereto, said that he investigated the warehouse involved here on February 28, 1961, in the company of Mr. Arne Bjornson, Deputy State Fire Marshal.

Crucial parts of his testimony are as follows:

"Q. And what did you see or observe upon making this investigation?

"A. The potato warehouse was locked. Mr. Bjornson obtained key and unlocked padlock, obtained lights and entered the potato warehouse. There was fire on the planking above and below the platform on the floor level and the heavy joist were burned, depth some of it about 4 inches deep. Another fire in southwest corner in basement extending from the floor about four feet up. There was no burning in between fire in basement and one up above.

"Q. Did you observe heater in the building.

"A. There was.

"Q. Did you examine it?

"A. We did.

"Q. Upon examining it what did you find?

"A. There was no evidence of any explosion from the heater and heater was not the origin of the fire above on the platform.

"Q. Did you check the fuses?

"A. We did.

"Q. What was finding in regard to fuses?

"MR. LEO: Objected to, no foundation.

"THE COURT: Overruled.

"A. I believe one was burned out and one was good.

"Q. Was there any wiring in the building that you checked?

"A. There was.

"Q. Was the wiring in the vicinity of the fire?

"A. Not of heavy burning.

"Q. What did you find upon examining this wiring?

"A. We found no bleeding in wiring which would disclose a short in wiring.

"Q. Did you find anything attributing fire to accidental cause?

"A. I did not.

"MR. LEO: Object to that, calling for opinion. Objected to, no proper foundation. He is not qualified to answer that question.

"THE COURT: Sustain that objection, Mr. Leo."

In response to a question concerning what odor was detected from splinters of wood that were taken from planking in the warehouse, Mr. Grossman testified that the odor was similar to kerosene or fuel oil.

The following is the pertinent testimony relating to Mr. Grossman's opinion as to the cause of the fire:

"Q. Mr. Grossman, from your previous training and education and experience, and from your observation and investigation made of the warehouse, do you have any opinion as to the cause of this fire?

"A. I do.

"Q. What is that opinion?

"MR. LEO: Object to that—

"THE COURT: Overruled.

"A. It was caused by human hands."

The thirteenth witness, Mr. Lawrence A. Koehler, State Food Commissioner and Chemist, merely testified that he received Exhibits 7, 8, 9, 11, 12, 13, and 14; that they were recorded, assigned a laboratory number and an analysis card; and that he then personally delivered the exhibits to Mr. Robert Werner for analysis.

As the specification of error which asserts "the verdict is contrary to the law and against the evidence" could eliminate the need to discuss the other specifications, this one will be discussed first. This specification we shall treat as an allegation that the evidence is insufficient to sustain the verdict, as other specifications involve the errors alleged in the law.

Section 12–34–02, North Dakota Century Code, upon which the charge and the information is based, provides:

"Every person who willfully and maliciously sets fire to, or burns, or causes to be burned, or who aids, counsels, or procures the burning of, any barn, stable, garage, or other building, whether the property of himself or of another, not a parcel of a dwelling house, or any shop, storehouse, warehouse, factory, mill, or other building, whether the property of himself or of another, or any church, meetinghouse, courthouse, workhouse, school, jail, or other public building, or any public bridge, shall be punished by imprisonment in the penitentiary for not less than one year nor more than ten years."

The criminal information, in setting forth the details of the crime, states that the defendant did "willfully and maliciously set fire to, or aided, counselled or procured the burning of a certain potato warehouse; * * *"

The authors of Corpus Juris Secundum state in general terms the function of the appellate court in reviewing questions of fact tried to a jury in a criminal case.

"a. General Principles

"Unless otherwise controlled by constitutional or statutory regulations, an

appellate court ordinarily will not review questions of fact tried by the jury, and it will not concern itself with the weight of the evidence to support the verdict other than to determine whether the evidence is sufficient in law to sustain the conviction." 24A C.J.S. Criminal Law § 1880 (1962).

This court, in State v. Braathen, 77 N.D. 309, 43 N.W.2d 202, stated:

"4. In passing upon a motion for a new trial based on the insufficiency of the evidence, the trial court is clothed with a wide discretion, and his determination with respect to such sufficiency will not be disturbed unless there appears to have been abuse of that discretion."

In another case based upon circumstantial evidence, State v. Moore (N.D.), 101 N.W. 2d 579, this court repeated the above proposition and then quoted from People v. Newland, 15 Cal.2d 678, 104 P.2d 778, at 780, where the court quoted from People v. Martinez, 20 Cal.App. 343, 128 P. 952, as follows:

" 'Where the circumstances are such as to reasonably justify an inference of guilt, as found by the jury, the fact that an inference of innocence might likewise be reasonably drawn therefrom does not present a question of law for review by an appellate court any more than does a verdict based upon direct conflicting evidence. In neither case will the verdict be disturbed. * * *' "

The defendant refers this court to 23 C.J.S. Criminal Law § 907 (1961), commencing at page 554, which reads:

" * * * inferences drawn must be consistent with the fact sought to be proved and wholly inconsistent with any other reasonable inference to the contrary, and not be forbidden by law or too remote, or merely possible, or based on suspicion. In case of an in-

ference of guilt, it must be the only inference that can reasonably be drawn from the facts proved; a conviction cannot be based on the weakness of accused's status or the embarrassing position in which he finds himself."

This, however, is not the rule for the guidance of the appellate court but is the rule for the guidance of the trial court and is compatible with the trial court's instructions in the instant case, which were not objected to at the trial of the case and which read in part as follows:

"I charge you that circumstantial evidence is legal, competent evidence, and crime may be proved by circumstantial evidence as well as by direct testimony of eye witnesses, if such evidence is of such a character as to exclude every other reasonable hypothesis than that of guilt of the defendant. Where a case rests entirely on circumstantial evidence, before the jury may find a defendant guilty basing its verdict solely on such evidence, each fact which is essential to complete a chain of circumstances that will establish the defendant's guilt must be proved beyond a reasonable doubt.

"The proof in order to convict the defendant upon circumstances alone must not only establish the fact that the circumstances concur to show that the defendant committed the crime charged beyond a reasonable doubt, but that such circumstances are inconsistent with any other rational conclusion. It is not sufficient that the circumstances proved coincide with, account for, and therefore render probable the hypotheses sought to be established by the State, but such circumstances must exclude to a moral certainty beyond a reasonable doubt every other theory but the single one of guilt. The jury is not required to find that it was not possible for any other person to have committed the crime before they can return a verdict of conviction, or, in other words, to find

that it is impossible for the defendant to be innocent. Such a degree of certainty is very rarely attainable in the administration of justice. It is sufficient that all the moral circumstances beyond a reasonable doubt point to the guilt of the defendant and are unexplainable upon any theory of innocence."

The authors of Corpus Juris Secundum, in discussing this matter, have this to say:

"While a case based on circumstantial evidence should be scanned with caution, the fact that the evidence is circumstantial and conflicting does not alone empower the appellate court to weigh it or determine its sufficiency, if it reasonably tends to prove the guilt of accused and fairly warrants a conviction. The question is whether there is evidence to support the verdict; and a verdict based on circumstantial evidence carries the same presumption of correctness as other verdicts, and will not be disturbed unless wholly unwarranted, even though the evidence is weak and unsatisfactory to the appellate court. The reviewing court is not required to explain the process by which the jury arrived at their determination.

"Where the circumstances are consistent with the hypothesis of accused's innocence as well as with that of his guilt, the jury, or the trial court trying the case without a jury, must draw the inference, and an appellate court will not substitute its judgment for that of the jury or of the trial court. This rule should not be confused with the rule laid down for the guidance of the trial court * * * that the evidence must be of a conclusive character and must exclude every reasonable hypothesis of innocence. * * * *" 24A C.J.S. Criminal Law § 1882 (1962).

■ This court will not substitute its opinion for the verdict of the jury, nor can it find that the trial court has abused its discretion in sustaining the jury's verdict of guilty in this case where the jury could reasonably have found from the evidence: that there was a burning of a warehouse; that the fire was willfully and maliciously set and not an accident; that the potatoes contained in the warehouse were over-insured, indicating a motive which the record does not disclose was held by anyone other than the defendant; that the defendant was the last person at the warehouse preceding the discovery of the fire therein and thus had an opportunity to set it; and that the defendant had evidenced a willingness to have the warehouse burned.

We will now consider the other specifications of error argued on the defendant's behalf.

The defendant alleges as error: "Failure of the Court to define the charge laid against the Defendant, as limited by the Bill of Particulars."

The pertinent part of the court's instructions in this connection reads as follows:

"On the 7th day of June, 1961, the State's Attorney of this County filed in this Court a criminal information charging the defendant with the crime of Arson of a Building Other Than a Dwelling Contrary to 12–34–02 of the Century Code, in the following language:

"That on or about the 18th day of February, 1961, in the County of Walsh and State of North Dakota, the above named defendant did commit the crime of Arson of a Building Other Than a Dwelling contrary to 12–34–02 of the Century Code, committed as follows, to-wit:

"That at the said time and place the said defendant did willfully and maliciously set fire to, or aided, counselled or procured the burning of a certain potato warehouse; that said potato warehouse belongs to one Victor Petulney, and was being used by the defendant for the storage of potatoes; that

said warehouse is located approximately in the Northwest Quarter of Section Twenty-five, Township One Hundred Fifty-five, Range Fifty-six."

The pertinent part of the bill of particulars reads as follows:

"6. Larry Carroll was at the warehouse on the evening of the 17th and the fire was set at that time by Larry Carroll, or possibly it was set on the morning of the 18th and furthermore, Larry Carroll had the opportunity and the desire to set the fire as will be more fully developed in testimony."

"8. The proving of the arson will be largely by circumstantial evidence and therefore further particulars as to *exactly* how the fire started, the *exact* time of starting and the *exact* method used are unknown to the State at this time."

The following is that part of the record relating to the submission of the proposed instructions to counsel prior to the oral presentation of same to the jury.

"THE COURT: Let the record show that prior to argument of the case to the jury there was handed to respective counsel the court's proposed instructions and I ask you now, Mr. O'Keefe, if you have any exceptions, exceptions or changes that you want to have made in these proposed instructions?

"MR. O'KEEFE: No, sir.

"THE COURT: Mr. Leo?

"MR. LEO: This would not be probably all the instructions—the jury should be instructed it is all right for the defendant to waive argument and then, of course, the state is not allowed rebuttal.

"THE COURT: I will make that statement orally to the jury.

"MR. LEO: Have no additions to instructions."

Our statute on this matter reads as follows:

"Charge—Exceptions before given.— The court may submit to the counsel in the case for examination the written instructions which it proposes to give to the jurors, and may require such counsel, after a reasonable examination thereof, to designate such parts thereof as he may deem objectionable, and thereupon such counsel must designate such parts of the instructions as he may deem improper, and thereafter only the parts so designated shall be deemed excepted to, or subject to exception." Sec. 29–21–33, N.D.C.C.

In No. 4 of the syllabus by the court in State v. Alfstad (N.D.), 98 N.W.2d 371, it is said:

"In a criminal action, where the trial court submitted written instructions to counsel for both sides and requested any exceptions or additions thereto to be made before the instructions were given by the court, and where counsel for defendant, the following day, noted certain exceptions to the instructions and the court made the corrections requested by defendant's counsel, and where defendant's counsel then stated in the record that the instructions were satisfactory to the defendant, he may not thereafter take exception to such instructions. Sec. 29–2133, NDRC 1943."

■ Although there is nothing in the record to indicate how long a period of time counsel were given to examine the proposed instructions, as this specification of error does not contend that the defense counsel did not have a reasonable opportunity to examine the instructions, we believe that Section 29–21–33, North Dakota Century Code, has been complied with and thus that the right to raise an objection to the instructions on appeal has been waived.

The defendant further alleges as error that the court permitted "the expert witness" Grossman to give his opinion as to the cause of the fire. The contention is that when the trial court permitted the witness to give his opinion as to the cause of the fire, he permitted an invasion of the province of the jury, and that this was prejudicial to the defendant and thus is reversible error.

On this subject Professor Wigmore had this to say:

"The Opinion rule day by day exhibits its unpractical subtlety and its useless refinement of logic. Under this rule we accomplish little by enforcing it, and we should do no harm if we dispensed with it. We accomplish little, because, from the side on which the witness appears and from the form of the question, his answer, i.e. his opinion, may often be inferred. We should do no harm, because, even when the final opinion or inference is admitted, the inference amounts in force usually to nothing unless it appears to be solidly based on satisfactory data, the existence and quality of which we can always bring out, if desirable, on cross-examination. Add to this that, under the present illiberal application of the rule, and the practice as to new trials, a single erroneous ruling upon the single trifling answer of one witness out of a dozen or more in a trial occupying a day may overturn the whole result and cause a double expense of time, money, and efforts; and we perceive the absurdly unjust effects of the rule. Add, finally, the utter impossibility of a consistent application of the rule, and the consequent uncertainty of the law, and we understand how much more it makes for injustice rather than justice. It has done more than any one rule of procedure to reduce our litigation towards a state of legalized gambling.
* * *

"The remedy (whenever one shall be undertaken) ought to be radical. The only purpose for which we need any weapon of the sort is the potential need of saving the time that in some cases might be otherwise taken by marshaling an interminable multitude of opinions, and of preventing the consequent confusion of issues and the possibility of forcing a verdict by mere preponderance of numbers and influential names. But all this is mere possibility; it would not even be feasible in the ordinary case; and, whenever it was feasible, and if it should then be attempted, the ordinary judicial discretion to limit the number of witnesses * * * and the rule requiring personal knowledge * * * would quite answer all practical purposes. For this reason there seems to be no objection against taking a radical step,—*the entire abolition of the rule* as such, leaving only in its place some specific discretion in the judge to meet the possibilities above mentioned." 7 Wigmore, Evidence Sec. 1929 (3d ed. 1940).

In this case Mr. Grossman testified that he was a special agent for the National Board of Fire Underwriters; that his duties were to assist local officers in "investigations of crimes arising from incendiary or fraudulent fires"; that he had a bachelor of science degree from the University of Nebraska; that after being graduated from the university he was a special agent of the Federal Bureau of Investigation for six years; that while such an agent he investigated suspected sabotage cases; that since 1946 he had been employed by the National Board of Fire Underwriters; that he had attended the arson school at Purdue University and the Northwestern Fire School at the University of Minnesota and had been an instructor at both schools for a number of years; and that he estimated that he had investigated between three and four thousand fires since becoming an employee of the National Board of Fire Underwriters.

Mr. Grossman further testified that in his investigation, he examined the warehouse and found evidence of fire in two places; that on examining the heater, he found no evidence that it had exploded nor that it was the origin of the fire on the platform; that he checked fuses and found one burned out and one good; that he examined the wiring and found that the wiring was not in the area of the heavy burning; and that he found no bleeding in the wiring which would disclose a short.

On being asked if he found anything attributing the fire to an accidental cause he said that he did not. An objection to this question was sustained by the court, but no direction was made that the question be stricken from the record and that the jury disregard it.

He further testified that various splinters of wood from the place where the fire occurred in the basement of the potato bin and splinters from the planking where the fire occurred above and below the platform had an odor similar to kerosene or fuel oil.

On being asked his opinion as to the cause of the fire, he said, "It was caused by human hands."

It is this answer that "It was caused by human hands" that the defendant contends was improper in that it concludes a material issue or ultimate fact which the jury alone should have decided.

Our court, in a murder case decided in 1938, sustained the trial court's ruling prohibiting the defendant from eliciting from certain medical doctors, who had not seen the deceased but who had been shown photographs of the deceased and had been given background information concerning circumstances surrounding the death, their opinion whether a wound was self-inflicted or was inflicted by some other person. The court said: "While expert testimony is admissible, for the enlightenment of the jury and to enable the jury to decide questions of fact, it is not permitted to have experts decide the ultimate question of fact in the case for the jury." State v. Gibson, 69 N.D. 70, 284 N.W. 209.

On the other hand, this court, in the more recent decision of State v. Maresch, 75 N.D. 229, 27 N.W.2d 1, decided in 1947, found no error in permitting a medical doctor who had taken part in the autopsy of the deceased person in a murder case to answer whether the injuries of the deceased which he had observed could have happened merely by falling on some inanimate object.

The court there said:

"* * * On the other hand, the jury was confronted with the question of whether the blow resulting in the injury was administered accidentally or by criminal violence. Thus to some extent the answer of the witness must naturally bear directly upon one of the questions that the jury must determine. In ruling upon the question the trial court was confronted with the dilemma of letting the jury in a sense speculate with respect to an important question or permitting them to be aided in their determination by the expression of the opinion of a medical expert."

In State v. Gore, 152 Kan. 551, 106 P.2d 704, 131 A.L.R. 1108, the Kansas court in an arson case allowed opinion testimony where the question involved the admissibility of testimony of a fire department captain who had investigated approximately 6,000 fires and who testified that his opinion was that the fire had been set by someone.

He had investigated the fire while the firemen were still fighting the fire; and in his investigation he found a pile of clothing mixed with paper in the middle of the floor, which pile was still burning when he arrived at the scene.

The said court frankly admitted that in their own earlier decisions a strict rule against the admissibility of opinion evidence was more rigorously applied than in

their more recent opinions. State v. Gore, supra.

As the Kansas case is comparable to the instant case, we believe the court's reasoning is pertinent here:

"Appellant urges the facts were so simple that the opinion or inference of an expert was unnecessary and that the jury should have been permitted to draw its own conclusion on the question of incendiary origin. It was permitted to reach its own conclusions. The jury was not obliged to accept the opinion of the witness. It was instructed it had to reach its own conclusion. Was the jury prejudiced by the opinion of the witness? If it is true, that from a mere statement or description of the conditions found by the expert, it was clear the fire had been set then it is a bit difficult to see just how the opinion of the witness, if incompetent, resulted in prejudicing the substantial rights of the appellant.

"While we have concluded the opinion of the witness was admissible we may also say the judgment cannot be disturbed for another reason. While we have not attempted to narrate all the evidence, the record, without the opinion evidence, strongly indicated the fire was of incendiary origin. It was ample to sustain the verdict. Under such circumstances, we would not be justified in disturbing the verdict. Sawyer v. State, 100 Fla. 1603, 1617, 132 So. 188; Tovey v. Geiser, [150 Kan. 149, 92 P.2d 3] supra. In 5 Encyclopedia of Evidence, 649, it is said: 'Error in the admission of expert testimony may not be ground for reversal where such testimony is merely cumulative, and there is an abundance of other evidence which is competent and which sustains the opinion of the witness. * * *'"

An annotation entitled "Expert and opinion evidence as to cause or origin of fire," contained in American Law Reports, cites cases from California, Florida, Kansas, Kentucky, Missouri, and Pennsylvania which have permitted opinion testimony by an expert or skilled witness specifically stating that the fire in question was "of incendiary origin" or "was set by someone."

"The opinion testimony by an expert or skilled witness specifically stating that the fire in question was 'of incendiary origin' or was 'set' by someone, whether given in a criminal proceeding or a civil action, has been held admissible in a number of cases where it appeared that the facts in evidence were such that the cause or origin of the fire was not within the common knowledge or experience of ordinary people and that testimony of an expert or skilled witness was helpful to the jury in determining the question." 88 A.L.R.2d 261.

We conclude, therefore, that it was not error for the trial court to admit opinion testimony of an expert witness as to the cause or origin of a fire: where the witness was qualified as an expert in the field of investigating fires; where the witness had made a careful examination of the premises of the fire involved in the prosecution; and where his experience, gained from formal training and from investigating many fires, caused his opinion to be of appreciable help to the jury in a field in which the ordinary juror needs help.

The defendant further contends that "the court erred in permitting evidence to show up in the record referring to matters connected with the previous fire (as disclosed in testimony taken in chambers)."

This specification relates to the fact that there had been two previous fires at the warehouse, one on February 12 and the other on February 14.

The trial court took the testimony of a number of witnesses out of the hearing of the jury relative to these other fires and

then ruled that there was a lack of foundation for admission of this testimony.

In support of this specification of error, the defendant cites 6 C.J.S. Arson § 30 (1937), as follows:

" * * * evidence that other fires occurred in the vicinity at or about the same time as the burning of the building alleged in the indictment, or that the same or other property of accused or prosecutor was on fire on previous or subsequent occasions, is not generally admissible in the absence of anything directly to show accused's connection with the charge for which he is on trial, * * *."

In a careful analysis of the evidence we find no proof of other fires. The jury had no way of knowing that there were other fires, as the evidence concerning other fires was taken before the court in chambers out of the hearing of the jury. The defendant contends that, as Exhibit 14, a cup from a "Thermos" bottle was seen by two witnesses on February 12 and no witness placed it on the scene of the fire of February 18, and as it later was picked up by Witness Bjornson on February 23 and was received in evidence, this was prejudicial error.

As Exhibit 14 was admitted without objection and as there was no evidence indicating it was not on the scene following the fire on the 18th, we must assume that it was there and that it would be treated the same as other materials found that day or on subsequent days of the investigation. As the jury did not have the benefit of the testimony taken by the court in its chambers, it could not have realized that the cup from the "Thermos" bottle had anything to do with other fires.

It is further contended that Exhibits 3 and 5 are both photographs of the fire in the basement and that the fire on the 18th was not in the basement but was on the floor level directly in front of the door.

Exhibit 5 was admitted without objection and thus cannot be complained of.

Exhibit 3 was objected to on the ground that Mr. Bjornson, who was identifying the exhibit, was not a photographer and thus there was improper foundation laid for the introduction of this exhibit. An examination of the record, however, indicates that proper foundation was laid for the introduction of Exhibit 3 and thus that the objection that the foundation was improper was properly overruled. Without hearing the testimony which was heard by the court in chambers, the jury could not have connected Exhibits 3 and 5 with other fires, nor could it have connected the testimony of witnesses Caseman and Grossman with other fires.

In conclusion, we find that the defendant had a fair trial and do therefore affirm the judgment and orders appealed from.

MORRIS, C. J., and STRUTZ, TEIGEN and BURKE, JJ., concur.